Commonwealth of Pennsylvania, Department of Public Welfare, Appellant, *v.* Harambee, Inc., Appellee.

Argued June 4, 1975, before President Judge Bow-MAN and Judges CRUMLISH, JR., KRAMER, WILKINSON, JR., MENCER, ROGERS and BLATT.

*Barnett Satinsky, Deputy* Attorney General, with him *Robert P. Kane,* Attorney General, for appellant.

*Richard N. Weiner,* with him *Hudson & Wilf,* for appellee.

OPINION BY PRESIDENT JUDGE BOWMAN, October 27, 1975:

The Department of Public Welfare (DPW) appeals from an award of the Board of Arbitration of Claims (Board) in favor of Harambee, Inc. (Harambee), a Maryland corporation, relating to a contract between DPW and Harambee, the "legality" of which is disputed by DPW.

Mismanagement or disregard of the law on the part of responsible Commonwealth officials cast the destiny of this disputed contract from its very inception. These departures have thus produced the anomalous but not necessarily legally unsound position asserted by the Commonwealth that it should not be bound by the contract. A brief history surrounding the contract, its execution, Harambee's performance thereunder, and the pitfalls it encountered, follows.

On January 1, 1973, Harambee's president affixed his signature to a memorandum of contract and thereby committed his company to the development and operation of two child welfare service facilities to be located in the city of Harrisburg. Although performance of Harambee's contractual duties was to commence immediately upon execution (and, in fact, did so commence), no one signed the contract on behalf of DPW or the Commonwealth until March of 1973. During this interim period, the con-

tract's contents were being subjected to examination and analysis. At this time, an analyst within the governor's budget office reviewed the contract and concluded that a proposed source of partial funding for the project was not legally available for its anticipated use. Prior to March of 1973, this conclusion was communicated to at least one of the Commonwealth's signators, but final execution of the contract nonetheless occurred.

The contract contemplated a total cost to DPW of $1.348 million, payable monthly upon the submission of invoices of expenses incurred by Harambee. From January 1, 1973 through July 31, 1973, Harambee submitted seven such invoices totaling $208,625.00 and received full remuneration from DPW. However, invoices totaling $110,980.00, for expenses incurred during the months of August through December, 1973, drew no response from DPW. In September of 1973, the Commonwealth, through the Department of the Auditor General, began to publically entertain serious doubts as to the propriety of the contract, but no attempt was made by Commonwealth officials directly concerned to discourage Harambee from continuing its performance. On October 23, 1973, Harambee received a letter from the then chief counsel of DPW, advising the company that the Justice Department viewed the contract as "illegal," but that alternative arrangements might be possible. Harambee continued to perform until January 14, 1974, when a letter unequivocally terminating the contract was received from the Justice Department.

On March 22, 1974, Harambee filed a complaint with the Board, demanding payment of its expenses incurred during the months of August through December of 1973, as well as its anticipated profit upon full performance of the contract. DPW answered, and, by way of new matter and counterclaim, demanded Harambee's return of all moneys paid it for the months of January through July of 1973. On November 15, 1974, after evidentiary

hearing, the Board awarded Harambee $88,990.38, representing both "expenses incurred" by Harambee, for which the company had not been reimbursed, and "benefits obtained by the Defendant [DPW]."[1] While neither the award nor the accompanying opinion of the Board makes mention of DPW's counterclaim, it was presumably denied, and DPW has not pursued its entitlement to said counterclaim before this Court. Rather, this appeal focuses upon the award to Harambee.

The Commonwealth both before the Board and this Court has repeatedly characterized the contract as "illegal." This characterization is misleading in the context of its usage here as obscuring the issue, since the want of legislatively appropriated funds for the payment of the Harambee project is the essence of the Commonwealth's defense to performing its obligations under the contract.

Article III, Section 24 of the Pennsylvania Constitution prohibits money from being paid out of the treasury except on appropriations made by law. The impact of this constitutional mandate may, under given circumstances, have the sweeping effect of rendering a contract entered into between the Commonwealth and a third party totally unenforceable and hence void. Under other given circumstances, however, its impact may render such a contract only partially unenforceable producing neither a void contract, nor necessarily an "illegal" contract. Our inquiry, therefore, must be directed to the circumstances of this case within the proscription of the constitutional mandate.

Harambee's contract, in the first numbered paragraph, makes it subject to "the availability of funds," a caveat to any person entering into a contract with the Common-

---

1. That the Board's award was lesser in amount than the unpaid invoices submitted by Harambee may be explained by the Board's finding that the October 1973 letter from DPW was a letter of termination as provided for by paragraph 30 of the contract.

wealth. While the record is silent as to when it occurred, there is endorsed upon the last page of the contract a reference to two sources of funding. Over the signature of the comptroller of the DPW it is certified that $294,543.00 is available under Appropriation Symbol 87, Program 402.[2] Underneath said signature is found the legend "Contingent Fund $1,054,252.00." The latter could more properly have been labeled a "fantasy fund." It did not exist, it does not exist, and any affirmation of its future existence can only be attributed to unbridled optimism. Uncontradicted testimony before the Board revealed the content of the numerated "appropriation symbol" as funds specifically appropriated for disbursement by DPW directly to counties for use in the child welfare field. These funds, specifically appropriated to DPW for another purpose, could not support a contractual duty assumed by DPW in favor of a nongovernmental entity, whether or not the consideration promised or provided by said nongovernmental entity would be identical to that intended through DPW/county interaction. *O'Donnell v. Philadelphia,* 385 Pa. 189, 122 A.2d 690 (1956) ; *Baxter v. Philadelphia,* 385 Pa. 424, 123 A.2d 634 (1956) ; *Tate v. Antosh,* 3 Pa. Commonwealth Ct. 144, 281 A.2d 192 (1971).

This limitation in scope of the designated appropriation is further evidenced by the reference, in the preamble of the contract, to Section 701 of the Public Welfare Code (Code)[3] as the statutory motivation and authority for the contract.

"The department [DPW] shall assure within the Commonwealth the availability and equitable provision of adequate public child welfare services . . . ."

---

2. An "appropriation symbol" is a method employed by the Commonwealth to identify the specific type of program for which the appropriated funds represented by the symbol may be expended.

3. Act of June 13, 1967, P.L. 31, *as amended,* 62 P.S. §701.

While the language of this section appears to place no restrictions upon the means adopted to perform the duty it imposes, Section 701 assumes a more confining posture when read in conjunction with the succeeding sections of Article VII of the Code. Each of these sections strongly suggests that, in requiring the development of public child welfare programs, the legislature contemplated DPW/county interaction as the sole method of effectuation. The lone instance in which an alternative method is permitted appears in Section 708 of the Code, 62 P. S. §708, where, after formal hearing and proof of county noncompliance with DPW regulations, DPW may avoid county participation and directly engage in affording child welfare services. Absent these conditions precedent, DPW may only act as a conduit for the disbursement of funds to the counties and as an overseer of county operations through its regulatory power.

In addition to supporting the nonenforceability of DPW's contractual liabilities, these statutory provisions raise serious questions as to the legality of the contract itself. Although not specifically raised by the Commonwealth, we view an attempt by DPW to engage in the direct funding of a nongovernmentally developed and maintained child welfare service program as exceeding its grant of authority under Article VII of the Code.

The contract offers additional symptoms of illegality by its identification of the intended beneficiaries of Harambee's child welfare service program. Harambee agreed to "develop and deliver day care services for Commonwealth employees." In so delimitating its intended beneficiaries, DPW appears to have misinterpreted its role, confusing that of a public servant with that of a public employer. While certain agencies of the Commonwealth may be vested with the authority to function within the Commonwealth's dimension of public employer, DPW is not among them in any asserted exercise of its authority under the Public Welfare Code. Under this

statute, DPW's raison d'etre is in providing public benefits, not employe benefits.

We, therefore, conclude that the contract between DPW and Harambee is both unenforceable by Harambee and an illegal contract. Either conclusion, standing alone, suffices to overturn the award of the Board, albeit for different reasons. Absent a properly legislated and sufficient appropriation, which is the case here, the Board may have jurisdiction to entertain the cause of action asserted, but it is powerless to make an award for want of enforceability. Conversely, the illegality of the contract denies the Board any authority to make an award for want of a contract entered into by the Commonwealth.[4] Here, Harambee asserted its claim under a document, the subject matter of which was beyond the statutory authority and power of the signators acting for the Commonwealth.

In so concluding, we recognize, of course, that the well established law pertaining to public contracts may seem harsh and inequitable. Its rationale, to protect the state's citizens and taxpayers against overreaching public officials, while of little comfort to third parties dealing with public officials, must nevertheless be our paramount concern.

> "A person who deals with a government official is bound to know the limitations of that official's authority and to govern himself accordingly. To weaken this principle would be to render abortive the mandatory requirements of the law in regard to the making of public contracts, and thus to destroy that salutary protection of the people against their own representatives which such legislation is designed to secure." *Luzerne Township v. Fayette County,* 330 Pa. 247, 252, 199 A. 327, 330 (1938).

---

4. Section 1, Act of May 20, 1937, P.L. 728, *as amended,* 72 P.S. §4651-1.

Accordingly, we enter the following

ORDER

Now, October 27, 1975, the award of the Board of Arbitration of Claims is set aside.