Milton J. Shapp, Governor, et al., Petitioners *v.* Grace M. Sloan, State Treasurer, Respondent. General Assembly of the Commonwealth of Pennsylvania, Intervening Respondent.

Argued October 5, 1976, before President Judge BOWMAN and Judges CRUMLISH, JR., WILKINSON, JR., MENCER, ROGERS and BLATT. Judge KRAMER did not participate.

314

*Melvin R. Shuster,* Deputy Attorney General, with him *J. Justin Blewitt, Jr.,* Deputy Attorney General, *Vincent X. Yakowicz,* Solicitor General, and *Robert P. Kane,* Attorney General, for petitioners.

*James M. Marsh,* Deputy State Treasurer and Chief Counsel, for respondent.

*Roland Morris,* with him *Duane, Morris & Heckscher,* for intervening respondent.

*Sarah C. Carey,* with her *Cladouhos & Brashares,* and, of counsel, *Townsend, Elliot & Munson,* for amicus curiae, Legis '50, the Center for Legislative Improvement.

OPINION BY PRESIDENT JUDGE BOWMAN, December 3, 1976:

Cross motions for summary judgment supported by voluminous pleadings, affidavits and exhibits posture this struggle of constitutional proportion between the executive and legislative branches of our State government over fiscal control of Federal funds allocated or allocable to Pennsylvania under sundry Federal aid programs authorized by Acts of Congress and administered by various Federal agencies.

Being of the view that the pleadings, affidavits and exhibits raise no substantial issues of fact material to the disposition of the legal issues, it is appropriate that this litigation be decided upon the cross motions. Affidavits and counteraffidavits devoted to charges

and denials that the General Assembly acted as it did without full knowledge or understanding and that it wants of ability to legislatively cope with the multitude of Federal aid programs available to Pennsylvania, we do not consider as material or relevant to the legal issues.

On July 7, 1976, the Governor, various cabinet officers and the Governor's Justice Commission filed a petition for review directed against the State Treasurer challenging the constitutionality of Acts Nos. 117-1976 and 17-A-1976. The petition for review asserts the unconstitutionality of these acts under the separation of power doctrine embodied in the Pennsylvania Constitution, the Supremacy Clause of the United States Constitution, and the Contract Clauses of both the United States and Pennsylvania Constitutions. Petitioners seek a declaratory judgment holding these acts unconstitutional, and a writ of mandamus and injunctive relief directing the State Treasurer to honor the requisitions presented by all proper State officials for Federal funds appropriated and allocated to them pursuant to Acts of Congress.

In addition, petitioners sought a preliminary injunction to enjoin the State Treasurer from refusing to honor requisitions presented for payment of Federal funds to the Department of Justice for salaries and operating expenses incurred by the Office of the Special Prosecutor. After a hearing on July 13, 1976, this Court entered an Order dated July 15, 1976, denying the full scope of the relief requested, but granted a preliminary injunction directing the State Treasurer to honor requisitions submitted on behalf of the Office of the Special Prosecutor and issue his warrant for the payment of up to $176,843.00. This amount represented the unexpended balance of Federal funds allocated by the Law Enforcement Assistance Administration to the Office of the Special Prosecutor for the

1975-76 fiscal year, and the total amount of such LEAA funds physically in the State Treasury at that time and not otherwise encumbered. We reached this conclusion on the theory that Acts Nos. 117-1976 and 17-A-1976 arguably did not reach these funds.

An appeal to the Supreme Court from our Order granting preliminary injunctive relief was taken by the General Assembly, which was permitted to intervene on an interim basis by our Order dated July 13, 1976. Petitioners cross appealed from our denial of full preliminary injunctive relief which would have directed the State Treasurer to honor all requisitions for LEAA funds submitted on behalf of the Office of the Special Prosecutor until this Court decides the merits of petitioners' action.

The General Assembly also sought a stay pending appeal of this Court's Order of July 15, 1976, which was denied by us on July 16, 1976. After hearing argument on the application for stay, Mr. Justice NIX partially stayed our Order on July 16, 1976, allowing the State Treasurer to pay out only $50,000.00 of the $176,843.00 pending consideration of the matter by the Supreme Court en banc. On July 21, 1976, the Supreme Court, in a per curiam Order, vacated Mr. Justice NIX' stay and reinstated this Court's Order of July 15, 1976.

To insure that the Office of the Special Prosecutor would be financially able to continue its law enforcement activities after the expenditure of the $176,843.00 authorized by this Court's Order, petitioners filed an application for injunction pending appeal with the Supreme Court. Argument on this application was heard by Mr. Justice NIX on August 25, 1976, and the application is presently sub judice before the Supreme Court.*

---

* By Order dated November 23, 1976, the Supreme Court of Pennsylvania denied the application and a supplemental application.

On September 8, 1976, this Court heard argument on the merits of the General Assembly's application to intervene, which has been granted. At that time, the Court took under advisement petitioners' motion for partial summary judgment as to the Federal funds being withheld from the Office of the Special Prosecutor by the State Treasurer.

On September 22, 1976, petitioners filed an application for modification of Order, requesting that the Court's Order of July 15, 1976, be modified to direct the State Treasurer to disburse additional LEAA funds now on deposit in the State Treasury to the Office of the Special Prosecutor. That application, the General Assembly's motion for summary judgment and petitioners' motion for partial summary judgment and cross motion for summary judgment are presently before this Court for disposition.

Asserting its constitutional right to coordinate and control the expenditure of Federal funds available to Pennsylvania under Federal aid programs as within its "power of the purse," the General Assembly in mid-1976 enacted two significant pieces of legislation. Over the Governor's veto, it enacted Act No. 117-1976 (S. B. No. 1542, Pr. No. 2068) effective June 29, 1976. Act No. 17-A-1976 (H. B. No. 1366, Pr. No. 3606), known as the Federal Augmentation Appropriation Act of 1976, was signed by the Governor on July 1, 1976, after he had line vetoed several appropriations contained in the legislation.[1]

We here note that although the record is not entirely clear on the subject, it is safe to assume that

_____

[1] Although we do not consider it in disposing of this litigation, the General Assembly passed and sent to the Governor on November 16, 1976, H. B. No. 2359, Pr. No. 3027, to be known as the "Supplemental Appropriation Act of 1976," which, among other appropriations, makes further appropriation of Federal funds allocated to Pennsylvania under several Federal aid programs.

while several methods are employed to transmit Federal funds allocated by the Federal government to an approved Federal aid program in Pennsylvania, the Federal funds are deposited into the General Fund of the Commonwealth and disbursed from it under current voucher or requisition procedures employed generally with respect to disbursements from the General Fund.

Before considering the constitutional attacks upon the aforesaid legislation, a brief history of General Assembly involvement with Federal aid programs and Federal funding allocated to Pennsylvania is indicated.

For more than a decade, the General Assembly has asserted and exercised, without apparent objection by the executive branch, a minimal fiscal control over Federal aid funds in the form of general provisions contained in appropriation acts, wherein grants made to the Commonwealth under various Federal aid programs were appropriated to the State agency which had applied for such Federal aid and had been or was in the process of being approved by a Federal agency to carry out a particular Federal aid program.

From 1961 to 1975, the annual appropriation act of the General Assembly contained a common provision, with minor variations, that:

Further, in addition to the amounts appropriated by this act, all moneys received from the Federal Government or from any other source as contributions for the programs provided herein shall be paid into the General Fund and are hereby appropriated out of the General Fund for the purposes of the respective appropriations.

During the latter years of this period as Federal aid programs became more numerous and afforded an increasing amount of Federal aid to Pennsylvania, these same appropriation acts, in addition to the fore-

going general provisions, also specifically appropriated Federal aid funds to and for the use of a particular State department or agency which had qualified for a particular Federal aid program. In some of these appropriation acts or by separate legislation, the General Assembly, with respect to particular Federal aid programs, authorized application to be made for a particular Federal aid program in some instances and in others imposed restrictions, limitations or conditions upon the application for or expenditure of Federal funds of particular Federal aid programs. We would also note that there is no dispute as to the exclusive power and authority of the General Assembly to appropriate or refuse to appropriate State matching funds when such funds are necessary under a Federal aid program as a condition to Federal approval. Nor is there a dispute as to the power and authority of the General Assembly to assert fiscal control over general revenue sharing programs of the Federal government available to Pennsylvania as one of the sovereign States of the Union.

Such minimal fiscal control by the General Assembly and its limited legislative actions in prescribing restrictions, limitations or conditions upon State participation in particular Federal aid programs continued at a rather even level until 1975. By its pleadings and affidavits, the General Assembly says that its increasing concern over the proliferation of Federal aid programs and the ever increasing Federal funds available to Pennsylvania from such programs is the reason that it decided to assume full fiscal control over them after a deliberate and deep study of the problem. Petitioners, on the other hand, attribute political motives or fundamental disagreements between the executive branch and the legislative branch as to the wisdom or desirability of such programs, particularly that of Federal aid to the Office of the

Special Prosecutor through the Governor's Justice Commission, as the reasons for the General Assembly legislative action with which we are here concerned. Again, we wholly discount as irrelevant and immaterial to the legal issues, all imagined or real motive or intent as between the petitioners and intervening respondent, the General Assembly.

The first issue raised by the parties is directed to the roles, powers and responsibilities of the executive and legislative branches of our State government under the Pennsylvania Constitution.

Do Acts Nos. 117-1976 and 17-A-1976 violate the doctrine of separation of powers as embodied in Articles II, III, IV and V of our Constitution?

Act No. 117-1976 and its complementary Act No. 17-A-1976 are not disputed as to their purpose or the clarity of their content.

In essence, Act No. 117-1976 prohibits the State Treasurer from issuing any warrant for requisition of funds derived from Federal funds or to be used as State matching funds incident to Federal aid programs unless specifically appropriated by the General Assembly. It also mandates that all such Federal funds be deposited in the General Fund without designation as a restricted or special account. Its complementary Act No. 17-A-1976 appropriates such Federal funds to the purposes of the Federal aid programs as is encompassed within such legislation.

As here relevant, Article II of our Constitution vests the legislative power of the sovereign Commonwealth in the General Assembly. Article III, Section 24, provides that ''[n]o money shall be paid out of the treasury, except on appropriations made by law . . . but cash refunds of taxes, licenses, fees, and other charges paid or collected, but not legally due, may be paid, as provided by law, without appropriation from the fund into which they were paid on warrant of the

proper officer.'' Article IV vests in the Governor the supreme executive power of State and commits him to faithfully execute the laws.

Petitioners contend that these provisions read together constitutionally invalidate the legislation in issue as an encroachment upon the executive power. The Federal funds in question, they argue, are not funds derived from State taxation or otherwise derived from State law but to the contrary are those of the Federal government to which it, the Federal government, has committed to State executive authority. This second premise, in effect, synthesizes petitioners' second argument of Federal supremacy, hereinafter discussed, as an element of its first argument.

The respondents argue to the contrary that the exclusive legislative power vested in the General Assembly together with its unspoken but recognized ''power of the purse'' are full warrant for its actions. They also remind us that the legislative acts of the General Assembly have long been held by the judiciary to be presumptively constitutional and will be struck down only when clearly, palpably and plainly violative of the Constitution.

As was aptly said in another context:

Throughout the history of our Country, the dividing line between and the boundaries and powers of the three separate co-equal branches of our Government,—namely, the Executive and the Legislative and the Judicial—are sometimes indistinct and are probably incapable of any precise or exact definition. This indefiniteness and unboundarized jurisdiction and power has often caused heated controversy in our National Capital. Generally, speaking, the Executive branch has the power to recommend legislation and the power and the duty to see that the laws are faithfully administered and carried out. The Legislative branch has the

power and the duty to pass legislation; and the Courts have the power, the duty and the responsibility of interpreting the Constitution and all legislation and determining whether legislation and presidential orders and all other questions and issues meet or violate the requirements of the Constitution.

*Stander v. Kelley*, 433 Pa. 406, 422, 250 A.2d 474, 482 (1969).

The problem is no less difficult within the context of this litigation and is aggravated by the ascending role of the United States government in our rapidly changing Federal-State relationship in these, the United States. Our Pennsylvania forefathers did not frame our Constitution with Federal aid in mind or even dreamed of. Yet it is a fact of life that by the carrot and stick technique the Federal government, through a plethora of programs, is offering an ever increasing amount of Federal aid funds to States subject to Federally imposed regulations. Today in Pennsylvania, Federal aid funds constitute a substantial and ever increasing amount of public money devoted to programs which, in the final analysis, are of a nature that for State purposes clearly fall within the legislative power to adopt or refrain from adopting. Legislative action or nonaction as to any particular program or programs is, in turn, subject to the scrutiny of and political action by the citizens of this Commonwealth.

This role of the General Assembly and its political accountability for legislative action was and is, in our opinion, the intent of our forefathers in vesting exclusive legislative power in the General Assembly subject only to gubernatorial veto and judicial scrutiny as to the constitutionality of enacted legislation. In also providing that no money shall be paid out of the State Treasury except upon *appropriation made by law* or, in cases of refunds, *as provided by law,* not

only was an additional link forged in the system of checks and balances in our tripartite form of State government, but also this provision manifests to us a clear intention that only by General Assembly legislative action may funds deposited in the State Treasury be paid out either by an appropriation act or other legislative action by the General Assembly.

Unless full weight is given to these essential principles and provisions of our Constitution, the legislative branch of our State government would have little or no role to play with respect to Federal aid programs with the corollary result that the executive branch in the name of supreme executive power would not be faithfully executing the laws of this Commonwealth but rather, as it saw fit, seeking and administering Federal aid programs free of any checks or balances and with little political accountability for such actions.

*Commonwealth v. Dollar Savings Bank,* 259 Pa. 138, 102 A. 569 (1917) and *Commonwealth ex rel. Bell v. Powell,* 249 Pa. 144, 94 A. 746 (1915), cited by petitioners in support of their position, to the contrary recognize the need for legislative action, but not necessarily an appropriation act, for the deposit into and payment of money out of the State Treasury.

In our opinion, Article III, Section 24, of our Constitution mandates that money paid into the State Treasury, whether derived from State taxation or any other source, may be paid out of the State Treasury only by legislative action in the form of an appropriation act or in the form of other statutory enactment of general or limited application as to particular subjects. Such legislative action, of course, rests with the General Assembly, and it is within its exclusive power and authority to appropriate money out of the State Treasury or to otherwise provide for disbursements therefrom.

If any doubt may exist in the meaning of these provisions of our Constitution, the legislative acts in question certainly do not clearly, palpably and plainly represent an invasion by the legislative branch upon the powers of the executive branch and, therefore, must be declared constitutional for this reason alone.

Also without merit is petitioners' second contention that Acts Nos. 117-1976 and 17-A-1976 violate the Supremacy Clause of the United States Constitution, U. S. Const. art. VI, cl. 2.[2] A duly enacted State law is not to be found in violation of the Supremacy Clause unless ''the repugnance or conflict [between the State and Federal laws] should be direct and positive, so that the two acts could not be reconciled or consistently stand together.'' *Sinnot v. Davenport,* 63 U.S. (22 How.) 227, 243 (1859); *Missouri, Kansas & Texas Railway Co. v. Haber,* 169 U.S. 613 (1898).

That such a conflict between Federal and State law must not be lightly found is a concept deeply rooted in our federalist system of government, *see Schwartz v. Texas,* 344 U.S. 199, 202-03 (1952); *Reid v. Colorado,* 187 U.S. 137, 148 (1902),[3] and such repugnance is not to be sought out where none clearly exists. *Jo-*

---

[2] ''This Constitution, and the laws of the United States which shall be made in Pursuance thereof; and all Treaties made, or which shall be made, under the Authority of the United States, shall be the supreme Law of the Land; and the Judges in every State shall be bound thereby, any Thing in the Constitution or Laws of any State to the Contrary notwithstanding.''

[3] In *Parker v. Brown,* 317 U.S. 341 (1943), it was said:

''In a dual system of government in which, under the Constitution, the states are sovereign, save only as Congress may constitutionally subtract from their authority, an unexpressed purpose to nullify a state's control over its officers and agents is not lightly to be attributed to Congress.'' *Id.* at 351.

The Court continued:

''The governments of the states are sovereign within their territory save only as they are subject to the prohibitions of the Constitution or as their action in some measure conflicts with powers

seph E. Seagram & Sons, Inc. v. Hostetter, 384 U.S. 35, 45, rehearing denied, 384 U.S. 967 (1966); Huron Cement Co. v. Detroit, 362 U.S. 440, 446 (1960). We shall, therefore, adhere to the view expressed in California State Board of Equalization v. Goggin, 191 F. 2d 726, 730 (9th Cir. 1951), cert. denied, 342 U.S. 909 (1952), that:

It would be unwise to foster conflict where Congress has manifested a desire for harmony. Any such conflict would necessarily entail an application of the fundamental doctrine that laws enacted pursuant to power delegated to the United States under the Constitution are the supreme law of the land, and state laws inconsistent therewith are to that extent invalid. . . . [W]here problems in the sphere of dual sovereignty are involved, legislation should receive a construction which permits both to function with a minimum of interference each with the other. (Emphasis added.)

Having reviewed those funding provisions of the Omnibus Crime Control and Safe Streets Act of 1968 (Act), 42 U.S.C.A. §§3701-3747, with which we are concerned, and granting to Acts Nos. 117-1976 and 17-A-1976 the presumption of constitutionality to which they are entitled under Federal law, Hannan v. City of Haverhill, 38 F. Supp. 234 (D. Mass.), aff'd, 120 F.2d 87, cert. denied, 314 U.S. 641 (1941), we do not find the required clear manifestation of Congressional intent to supersede the exercise of those powers vested in the General Assembly by our Constitution.[4] The

delegated to the National Government, or with Congressional legislation enacted in the exercise of those powers." Id. at 359-60.

[4] We note that an intent on the part of Congress to "force directly upon the States its choices as to how essential decisions regarding the conduct of integral governmental functions are to be made" would be of questionable constitutionality. The National League of Cities v. Usery,    U.S.    , 49 L.Ed. 2d 245, 259 (1976).

voluntary nature of participation in the Federal funding program administered by the Law Enforcement Assistance Administration, and particularly Section 301(c) of the Act, 42 U.S.C.A. §3731(c), providing for State matching funds, lead us to conclude that Acts Nos. 117-1976 and 17-A-1976 present no Supremacy Clause violation.

Similarly, a review of other Acts of Congress authorizing sundry programs of aid to the States and encompassed within the scope of this litigation, convinces us that Congress did not intend to supersede the legislative power of our General Assembly with respect to these other Federal aid programs.

Lastly, petitioners argue that Acts Nos. 117-1976 and 17-A-1976 impair contractual obligations between the Commonwealth and both the Federal government and those private agencies acting as subgrantees of the State agency approved by the Federal authorities to carry out a Federal aid program.

We assume that petitioners limit this argument to approved Federal aid programs in effect at the time of passage of Act No. 117-1976. If Act No. 117-1976 is otherwise constitutional as not violative of the doctrine of separation of powers and as within the legislative power, its prospective application to future Federal aid programs cannot be questioned on the grounds here asserted. *Department of Public Welfare v. Harambee, Inc.*, 21 Pa. Commonwealth Ct. 430, 346 A. 2d 594 (1975).

While respondents argue with some persuasion that the Federal aid programs here affected are grants of conditional gifts and not traditional common law contracts within the protection of the Federal and State Constitutions proscribing their impairment, we shall treat them as contracts. We are of the view, however, that even though it may be successfully argued that Act No. 117-1976 has an impact upon existing approved

Federal aid programs, it does not follow that such impact violates the impairment of contract provisions of our State and Federal Constitutions.

In *Home Building & Loan Association v. Blaisdell,* 290 U.S. 398, 434-35 (1933), Mr. Chief Justice HUGHES said:

> Not only is the constitutional provision qualified by the measure of control which the State retains over remedial processes, but the State also continues to possess authority to safeguard the vital interests of its people. It does not matter that legislation appropriate to that end 'has the result of modifying or abrogating contracts already in effect.' Stephenson v. Binford, 287 U.S. 251, 276. . . . This principle of harmonizing the constitutional prohibition with the necessary residuum of state power has had progressive recognition in the decisions of this Court.

Our Supreme Court has recognized the doctrine of *Blaisdell* in sustaining our Pennsylvania Rent Withholding Act, Act of January 24, 1966, P.L. (1965) 1534, *as amended,* 35 P.S. §1700-1 et seq., against a similar attack. It said:

> ' "[T]he interdiction of statutes impairing the obligation of contracts does not prevent the state from exercising such powers as . . . are necessary for the general good of the public, though contracts previously entered into between individuals may thereby be affected." '

*DePaul v. Kauffman,* 441 Pa. 386, 398-99, 272 A.2d 500, 506 (1971).

Both of these cases involved the exercise of the legislative police power not here directly in issue. However, we believe their rationale to be applicable to the general exercise of the legislative power within the scope of Article II, Section 1, of our Constitution not otherwise prohibited by Article III.

The State interest demonstrated by an exercise of legislative power for the purpose of coordinating State fiscal policy with Federal grants in aid cannot be said to impair contracts in force even though the exercise of such legislative power may directly affect such contracts. In such cases, the impairment of obligations of contract constitutional protections must give way to the residuum of the State legislative power with respect to such programs, and those third party agencies who contract to execute such programs do so subject to this power.

For the foregoing reasons, we enter the following

ORDER

Now, December 3, 1976, the cross motions for summary judgment by respondent and intervening respondent are hereby sustained. Accordingly, judgment is hereby entered in favor of Grace M. Sloan, State Treasurer, and the General Assembly of the Commonwealth of Pennsylvania.

Petitioners' cross motion for summary judgment is dismissed, their motion for partial summary judgment is dismissed and their application for modification of our Order of July 15, 1976, is denied.