## Reimbursement for Flood Loss

GORNISH, *Acting Attorney General,* ARENS-BERG, *Deputy Attorney General,* LILIEN, *Deputy Attorney General,* August 11, 1978—This official opinion is directed to the question of the constitutionality of the Act of April 28, 1978, no. 1978-51. You were previously advised by this office that the act is unconstitutional under Article III, §29, and that it is not rendered constitutional by Article VIII, §17(B) of the Constitution. Because that opinion was not signed by the previous attorney general, under the unusual circumstances which then obtained in this office, and since we had not afforded the state treasurer and auditor general the opportunity to comment on the opinion under section 512 of the Administrative Code of April 9, 1929, P.L. 177, as amended, 71 P.S. §192,[1] we requested their comments. We have now received and reviewed their replies, and are submitting our official opinion after another review of all the issues.

---

1. There is some question whether the issue before us is required to be submitted to the State treasurer and auditor general under section 512, which refers to the "interpretation" of an appropriation act or act authorizing the expenditure of money. This opinion deals with the "validity" rather than the "interpretation" of an act. However, it is and shall continue to be our policy that any opinion which deals with such matters should be submitted to the State treasurer and auditor general.

It is our opinion that Act 1978-51 (which became law by the governor deliberately refusing to sign it so that the constitutional issues, which this office had raised to him, could be resolved) violates Article III, §29 of the Pennsylvania Constitution; is not rendered constitutional by Article VIII, §17 of the Pennsylvania Constitution; and that this office has not only the authority, but the duty to advise you under the circumstances not to approve any payments under the act.

I. Act 1978-51 purports to allow grants of money to persons who suffered property losses in the flood of July, 1977, to cover a portion of their loss of non-business or non-farm personal property.

Article III, §29 of the Pennsylvania Constitution provides:

"No appropriation shall be made for charitable, educational or benevolent purposes to any person or community nor to any denominational and sectarian institution, corporation or association: Provided, That appropriations may be made for pensions or gratuities for military service and to blind persons twenty-one years of age and upwards and for assistance to mothers having dependent children and to aged persons without adequate means of support and in the form of scholarship grants or loans for higher educational purposes to residents of the Commonwealth enrolled in institutions of higher learning except that no scholarship, grants or loans for higher educational purposes shall be given to persons enrolled in a theological seminary or school of theology."

It is our opinion that the grant provided by Act 1978-51 clearly violates Article III, §29 of the Pennsylvania Constitution as it has been interpreted by

the courts of Pennsylvania. Recompensing individuals who have suffered a property loss in a flood is not one of the allowable purposes for which a charitable, educational or benevolent grant may be made under the Constitution. On this issue, we adopt and follow the reasoning contained in the earlier opinion of this office, which we now summarize.

In a prior opinion of the attorney general discussing the standards to be applied in construing Article III, §29, we expressly recognized that "[t]he history of the construction of this section shows a growing limitation upon the scope of its prohibitive effect." Opinion 154 of 1972, 1972 Op. Att'y Gen. 149.[2] Under the guise of an expanding notion of

2. This program is clearly distinguishable from the emergency disaster loan program we upheld in Opinion no. 154 of 1972. That program was undertaken under the Industrial Development Authority Law of August 23, 1967, P.L. 251, as amended, 73 P.S. §371 et seq., which allowed loans to businesses, the constitutionality of which had been upheld in Basehore v. Hampden Industrial Development Authority, 433 Pa. 40, 248 A. 2d 212 (1968). The distinctions are clear. In that program there were short-term loans as opposed to grants; the purpose of the loan was specifically limited to rehabilitating business property which had been damaged in the flood (pending permanent loans by the Small Business Administration), as opposed to a grant of money which could be used for any purpose by the recipient; the law under which the loans were to be made had been held constitutional (because it had the public purposes of combatting unemployment and encouraging industrial development), as opposed to a grant for flood damages which has never been recognized to be constitutional. As we stated in that opinion (1972 Opinions at 150): "Finally, there is no gratuity or charity involved in the program because nothing is given away. It is not grants which will be made but loans secured by notes and repayable in the near future from the federal loans to which the recipients are entitled."

public duty and function, the Pennsylvania courts have had no difficulty in sustaining the validity of statutes providing benefits to the poor and unemployed. See Com. v. Perkins, 342 Pa. 529, 21 A. 2d 45 (1941), aff'd per curiam, 314 U.S. 586 (1942) and Com. ex rel. Schnader v. Liveright, 308 Pa. 35, 161 Atl. 697 (1932). The Supreme Court has, however, been careful to emphasize that merely because a statute can be characterized as "humanitarian" or to the benefit of all persons, it will not necessarily satisfy the constitutional requirement of public function or purpose: Kurtz v. Pittsburgh, 346 Pa. 362, 31 A. 2d 257 (1943). Rather, the decision in each case must rest upon the determination of whether the public receives or will receive a corresponding benefit from the payment of public funds: Loomis v. Philadelphia School District Board, 376 Pa. 428, 103 A. 2d 769 (1954); Kurtz, supra.

Applying these principles to the Act of April 28, 1978, we find that the grant program does not meet the public benefits test of the cases construing Article III, §29. The proposed program is benevolent because it is a recognition by the state of individual loss and an attempt at individual recompense. The program does not exclusively benefit the poor or unemployed; anyone, regardless of financial status, can receive a grant for property damaged. The expanding notion of public duty and function cannot justify a program that does not exclusively benefit the poor and unemployed. Accordingly, there is no corresponding public benefit to be derived from the payment of these funds. This program is strictly a pay-out from the State treasury to an individual, and by no stretching of the cases on point can such an individual aid program be justified.

II. We next consider the question of whether Act

1978-51 comes within either section 17(A) or (B) of Article VIII of the Pennsylvania Constitution, which contain exceptions to Article III, §29. In order properly to evaluate this question, it is necessary to review the history of paying state flood relief grants to individuals.

After the great flood of June, 1972, caused by Hurricane Agnes, the legislature, recognizing the extensive property damage suffered by many of the citizens of Pennsylvania, sought to compensate them through the payment of direct grants. Realizing the constitutional impediments to such a program, the legislature resolved to submit a constitutional amendment to the electorate. The general assembly expressly acknowledged the constitutional prohibitions against such direct grants in Joint Resolution no. 1 of 1972. That resolution stated that: "The General Assembly desires to alleviate such storm or economic deprivation caused by the flood, *but is limited in its efforts by rigid restrictions in the Constitution of the Commonwealth of Pennsylvania.*" (Emphasis supplied.)

The aforegoing shows a clear legislative recognition that such direct payments are in violation of the Constitution, presumably Article III, §29. The general assembly therefore resolved to add Article VIII, §17 to the Pennsylvania Constitution and submit the same to the voters for approval. Article VIII, §17, as submitted to the electorate in 1972, pertinently stated that:

*"Notwithstanding any provisions of this Constitution to the contrary,* the General Assembly shall have the authority to enact laws providing for tax rebates, credits, exemptions, grants-in-aid, State supplementations, or otherwise provide for

special provisions for individuals, corporations, associations or nonprofit institutions, including nonpublic schools (whether sectarian or nonsectarian) in order to alleviate the danger, damage, suffering or hardship faced by such individuals, corporations, associations, institutions or nonpublic schools as a result of Great Storms or Floods of September, 1971, of June, 1972 . . ." (Emphasis supplied.) This amendment was approved by the voters in November, 1972.

Thereafter, pursuant to the permission granted by the electorate in adopting Article VIII, §17, the legislature passed the Act of May 11, 1973, P.L. 27 (Act 13), which authorized direct appropriations to owners of homes or personal property to compensate them for flood losses.

In September, 1975, the Commonwealth was once again extensively inundated by flood waters from Hurricane Eloise. The legislature, again desiring to provide direct grants to flood victims, and again recognizing the problems of Article III, §29, proposed an amendment to Article VIII, §17 by adding to the end of section 17 the phrase "or of 1974, or of 1975." Joint Resolution no. 2 of 1975. This had the effect of permitting payments of direct grants to individuals suffering damages from the 1975 flood, but the legislature did not pass enabling legislation to implement this permission. Thus, the only grants paid to individuals were derived from Federal moneys, as provided in Public Law 93-288 (discussed infra.), with matching State funds under the constitutional authorization.

With this background of how the legislature dealt with previous disasters, we turn our attention to the present question of the 1977 flood. House Bill no.

304 of 1977 was introduced and passed by the House of Representatives on March 29, 1977. The version of the bill that passed the House (Printer's no. 808) repeated the language of then Article VIII, §17, and proposed, for submission to the electorate, an amendment to this provision, by adding to the end thereof "or of 1976, or of 1977. . . ." Thus, although the Johnstown flood had not occurred at the time of House approval of the bill, the language initially passed by the House, assuming it was thereafter approved by the voters, would have allowed for the payment of direct grants to Johnstown flood victims because the disaster in fact occurred during 1977.

The bill was sent to the Senate shortly thereafter and was referred to the Constitutional Changes and Federal Relations Committee. The bill was consigned to committee until July 25, 1977, some five days after the Johnstown flood, when it was reported out.[3]

The bill that was reported out (Printer's no. 1839) warrants careful scrutiny for the differences between this bill and prior legislative action on such problems form part of the basis for our conclusion that Act 1978-51 is unconstitutional. In the first place, the bill that was reported out deleted the phrase "or of 1977 . . ." from the language which had previously been utilized to waive the prohibitions of Article III, §29.

Another important difference can be found in the purpose clause of the amendment. The purposes of both previous constitutional amendments, Joint

---

3. We assume that the reporting out of the bill on July 25 was in direct response to the disaster.

Resolution no. 1 of 1972, supra, and Joint Resolution no. 2 of 1975, had been stated to be: "Proposing an emergency Constitutional amendment to the Constitution of the Commonwealth of Pennsylvania *granting the General Assembly the power to enact special laws to aid certain individuals, corporations, associations, institutions or nonpublic schools adversely affected by conditions caused by certain storms or floods.*" (Emphasis supplied.) This was also the same legislative purpose which was found in House Bill no. 304, as originally introduced. The bill that was reported out of the Senate Committee—the language of which was subsequently approved by the General Assembly—deleted the emphasized language and substituted new language, so that the final purpose of Joint Resolution no. 2 of 1977 (House Bill no. 304) read as follows: "Proposing an emergency Constitutional amendment to the Constitution of the Commonwealth of Pennsylvlania *providing that special emergency legislation may be enacted when federal emergency or disaster assistance is available.*" (Emphasis supplied.)

Once again we see the legislature deleting language which had previously been utilized to waive the prohibitions of Article III, §29. In its stead it added language which speaks directly of and makes specific reference to Federal disaster relief assistance. This was accompanied by changes to the body of the resolution and the addition of a new subsection to section 17. Section 1 of the bill provided:

"Many Pennsylvanians have suffered greatly from the ravages of great storms and floods in recent years. The great storms or floods of 1974, 1975, 1976 and 1977 were additional major disasters

causing loss of life and great damage and destruction to property of individuals, industrial and commercial establishments and public facilities.

"It is imperative that the victims of these disasters receive the fullest possible aid from both the Federal Government and the Commonwealth in order to accomplish a speedy recovery.

"The Congress of the United States, through enactment of the Disaster Relief Act of 1974, Public Law 93-288, has authorized the making of certain disaster relief grants. The General Assembly wishes to make such Federal Disaster Relief Grants, or other grants made available from Federal programs hereafter enacted, available to eligible individuals and families in order to alleviate the deprivation caused by storms or floods which have occurred in the past and seeks to address those emergencies of future years. However, the General Assembly is limited by rigid restrictions in the Constitution of the Commonwealth of Pennsylvania. The safety and welfare of the Commonwealth requires the prompt amendment to the Constitution to aid those already inflicted by the great storms of 1976 or 1977 and any further emergency that may strike Commonwealth citizens."

In order to effectuate a proper constitutional adjustment to permit receipt of Federal disaster relief funds, subsection (B) was added to Article VIII, §17.[4] It provided:

"(B) Notwithstanding any provision of this Constitution to the contrary, subsequent to a presidential declaration of an emergency or of a major disaster in any part of this Commonwealth, the General

---

4. That which was previously section 17 thus became section 17(A).

Assembly shall have the authority to make appropriations limited to moneys required for federal emergency or major disaster relief. This subsection may apply retroactively to the great storms or floods of 1976 or 1977."

As finally adopted, additional changes were made to section 17(B), which now reads:

"(B) Notwithstanding the provisions of Article III, section 29 subsequent to a presidential declaration of an emergency or of a major disaster in any part of this Commonwealth, the General Assembly shall have the authority by a vote of two-thirds of all members elected to each House to make appropriations limited to moneys required for federal emergency or major disaster relief. This subsection may apply retroactively to any presidential declaration of an emergency or of a major disaster in 1976 or 1977."

Section 17(A) as finally adopted was also amended to reinsert "1976," but *not* "1977."

Significantly, *only* subsection (B) ("this subsection") applies to "floods of 1976 or 1977." Moreover, section 17(B) permits the General Assembly, by two-thirds vote of each house, to "make appropriations *limited* to moneys required for federal emergency or major disaster relief." The legislature, by use of the word "limited," manifested an intention that the substantive provisions thereinafter set forth be more restrictive than the legislative grant in 17(A).

In excluding applicability of the permissive language in subsection (A) to the year 1977, *with full knowledge of the Johnstown disaster,* while at the same time adding the amendment making specific reference to Federal disaster legislation, and making *it* applicable to 1977, the legislature evinced an

intent not to permit the payment of direct state grants to the affected citizens of Johnstown by not submitting the question to the voters.

Counsel to the State treasurer and auditor general, in their comments submitted to us, both conclude that Act 1978-51 is constitutional under Article VIII, §17(B). The auditor general states that the word "federal" should be held to modify only the word "emergency" but not the phrase "major disaster relief." The use of the conjunction "or" between these words is emphasized to support that "or" signifies an intent to ascribe to the term "major disaster relief" a meaning wholly unrelated to the preceding "federal emergency." It is argued under this interpretation that moneys allocated for "major disaster relief" are not limited to Federal benefits, but may derive purely from State revenues, i.e., Act 1978-51 State grants. To reach this conclusion, however, we would have to overlook the context in which the amendment was adopted and the remaining provisions of House Bill no. 304. House Bill no. 304, Printer's no. 1861, as finally adopted, clearly stated its purpose to be that of "providing that special emergency legislation may be enacted when *federal emergency or disaster assistance is available.*" (Emphasis supplied.)

Both of those terms are specifically defined in the Federal Disaster Relief Act of May 22, 1974, 88 Stat. 153, 42 U.S.C.A. §5171, et seq. This act (Public Law 93-288) which is specifically cited in the amendment, shows the following: Section 408(A) of Public Law 93-288, 42 U.S.C.A. §5178(A), authorizes the President to make grants to a state for purposes of meeting disaster-related needs of "individuals or families adversely affected by a *major disaster.*" (Emphasis supplied.) "Major disaster" is defined by section 102 of the act, 42 U.S.C.A.

§5122, as a "... storm, flood, ... which, in the determination of the President, causes damage of sufficient severity and magnitude to warrant major disaster assistance under this chapter, above and beyond *emergency.*" (Emphasis supplied.) "Emergency" is separately defined in section 102, supra, as that "which requires Federal emergency assistance to supplement State and local efforts to save lives and protect property." "Emergency assistance" is also provided for in 42 U.S.C.A. §5145. Determinations of either "emergency" or of a "major disaster" are made by the President after reviewing the request by the state governor: 42 U.S.C.A. §5141. Based on request to find that an emergency exists, "the President may determine that an emergency exists which warrants Federal assistance." 42 U.S.C.A. §5141(A). Based on a request to declare a major disaster, "the President may declare that a major disaster exists, or that an emergency exists." 42 U.S.C.A. §5141(B). See also section 306(A), 42 U.S.C.A. §5146: "In any major disaster or emergency. ...."

Accordingly, we do not agree with the auditor general's interpretation. The use of "federal emergency" and "major disaster relief" in section 17(B) is directly related to the grants which were made available by the Federal government and are to be given the same meaning as the Federal act which gives them life.[5]

The state treasurer also relies on the language of Article VIII, §17(B) which refers to "a presidential declaration of an emergency or of a major disaster. ...." He reads this to refer either to a presidential

---

5. It should be noted that implicit in the auditor general's argument is the authorization to the legislature to determine what constitutes a "major disaster." Significantly, Act 1978-51 does not purport to make such a determination.

declaration of an emergency or to the "occurrence of a major disaster." For the reasons above-stated we do not believe that this is a proper reading of the Constitution because it completely ignores the context of Federal law under which it was adopted. In addition, there would have been no need to repeat the word "of" in the clause quoted. Indeed, it would not even be grammatical to use that word under the State treasurer's interpretation. Furthermore, the second sentence of the constitutional provision states that it applies "retroactively to any presidential declaration of an emergency or of a major disaster in 1976 or 1977." Clearly, if the State treasurer were correct, the second "of" should have been "to."[6] It is therefore our conclusion, as expressed above, that the reference to both of these terms is not to divorce them from a presidential declaration, but rather to tie them to the Federal Disaster Assistance Act, as we have shown. Moreover, the whole purpose of the constitutional amendment adopting Article VIII, §17(B) shows that this was the purpose.

Thus, we conclude that, given the deletion of "1977" from section 17(A) and the use of the term "major disaster relief" in the context presented in section 17(B), the legislature did not present to the voters the question of whether they wanted to continue and expand the State flood relief grants to include the Johnstown flood victims. Accordingly, Act 1978-51 does not escape invalidity under Article III, §29 by virtue of Article VIII, §17.

6. It should also be noted that this sentence was amended to read as it does on final consideration to make specific reference to a "presidential declaration of an emergency or of a major disaster" rather than "to the great storms or floods of 1976 or 1977."

III. The final question is what effect is to be given to our conclusion that Act 1978-51 is not sanctioned by the Constitution. Both the auditor general and State treasurer have observed that only the judicial branch of government can declare a statute unconstitutional. Further concern is expressed in that the attorney general has a duty to represent the departments of the Commonwealth and that he must do his utmost to argue and sustain an enactment of the General Assembly. Reference is made to the case of Hetherington v. McHale, 10 Pa. Commonwealth Ct. 501, 311 A. 2d 162 (1973), to support this position. Finally, it is pointed out that neither of the fiscal officers is bound by an opinion of the attorney general regarding constitutionality.

We appreciate the thoughts and opinions of the fiscal officers. We are cognizant of the fact that only the judiciary can declare a statute unconstitutional. On the other hand, we are bound by our oath to support, obey and defend the Constitution of Pennsylvania and our duty to advise State agencies of their responsibilities under law. This is not antithetical to our duty to represent such agencies because we will represent them in any litigation arising from our opinions. This is a position which has been taken by attorneys general going back to the early days of our 1874 Constitution.[7] See Com. ex rel. Wolfe v. Butler, 99 Pa. 535 (1882); Collins v. Com., 262 Pa. 572, 106 Atl. 229 (1919); Com. ex rel.

---

7. As early as 1881, Attorney General Henry W. Palmer stated in his opinion advising the State treasurer not to make certain payments to members of the general assembly:

"It is the *right* of a private citizen to question the constitutionality of any act of assembly that infringes upon his rights and bring it before the courts for adjudication. It is the *duty* of a public officer who is sworn to support, obey and defend the

Schnader v. Liveright, 308 Pa. 35, 161 Atl. 697 (1932). In Com. ex rel. Woodruff v. Lewis, 282 Pa. 306, 127 Atl. 828 (1925), the court recognized the right of an officer of the Commonwealth not to follow a law he believed was unconstitutional so that a proper suit could be brought to determine its validity.

Even those attorneys general who took a more conservative view, such as Attorney General Bell, advised his then client, the auditor general, that while he would not tell him that a statute was unconstitutional, if the auditor general had "substantial doubt" of the constitutionality of the act in question, he should decline to comply with the act so that the matter could be litigated: Mothers' Pensions, 1913-14 Pennsylvania Attorney General's Opinions 47, 52, 41 C.C. 216, 222 (1913).

Even in Hetherington v. McHale, supra, where the Commonwealth Court held that the attorney general ordinarily should not issue such opinions, the court recognized exceptions.

"If the Attorney General in his opinion believes that a statute is unconstitutional, he has the right and indeed the duty to either cause to be initiated an action in the courts of this Commonwealth and thus obtain judicial determination of the issue or he may prepare for submission to the General Assembly, such revision of the statute as he may deem advisable. . . ." 10 Pa. Commonwealth Ct. at 511.

---

Constitution to raise such a question and procure judicial determination whenever required to pay out public money under acts which he is properly advised are not sanctioned by the Constitution."

It is significant that on appeal the Supreme Court, in reversing the Commonwealth Court, did not discuss the opinion of the Commonwealth Court relating to the attorney general's power, but rather *held, on the merits, that the opinion of the attorney general was correct:* 458 Pa. 479, 329 A. 2d 250 (1974), reversing 10 Pa. Commonwealth Ct. 501 (1973).

Even accepting the above-quoted statement of the Commonwealth Court, it recognized the "right and indeed the duty" of the attorney general to "cause to be initiated an action in the courts of this Commonwealth." In this particular case, the *only way* that the attorney general can "cause to be initiated an action in the courts of the Commonwealth" is to advise the Department of Public Welfare that his conclusion precludes the department from paying the grants. Those individuals who have claims and believe that the statute requires them to be paid will then have the right to commence actions against the Commonwealth to have them paid. The result of this opinion will be the fulfillment of the suggestion of the Commonwealth Court. The suggestion of submitting legislation is illusory in this case. There is no action that we ourselves could initiate to test the issue.[8]

Our action in issuing this advice does not encroach on the judicial function, because it does not declare the statute to be unconstitutional. It rather

---

8. Where such a course is available, we have pursued it. See Shapp v. Sloan, 480 Pa. 449 (no. 214 Jan. term, 1977) (July 19, 1978), affirming 27 Pa. Commonwealth Ct. 312, 367 A. 2d 791 (1976).

acts as the catalyst to bring the issue before the courts when, in fulfilling our responsibilities under the Administrative Code, we conclude that a state agency should not administer a certain statute because it is unconstitutional.[9] This view was perhaps best summarized by then Attorney General Packel in his brief to the Supreme Court of Pennsylvania in Hetherington v. McHale:

"The advice of unconstitutionality given to the official does not suspend or abrogate the statute. It tells the official that, unless otherwise ordered by a court he may disregard a statutory provision. Such an opinion is in no way binding upon the public. The law is still on the books . . . [A]ny aggrieved person has a right to go to court to test the propriety of the official's conduct. It is for this reason that the opinion of the Attorney General refers to the obligation of the public official to disregard a provision believed to be unconstitutional and does not make a bald declaration of unconstitutionality."

## CONCLUSION

We have set forth our views in full because we believe that our advice on an issue of this nature should not issue lightly. We are aware of our duty to try to find a constitutional basis for state statutes

---

9. Significantly, in the first case in which the Supreme Court of Pennsylvania held that the judiciary had the authority to *declare* a statute unconstitutional, it recognized the duties of the executive branch in this regard as well: "Whether in the sphere of the Legislative, *Executive* or Judicial department, he is bound to maintain and uphold those compacts made with the people . . . In the *Executive* branch he shall carefully *avoid every act* which may have that injurious tendency." Emerick v. Harris, 1 Barr 416, 424 (1808). (Emphasis supplied.)

wherever possible, and have striven to do so. In this regard, we appreciate the views of counsel to the auditor general and counsel to the state treasurer. Nevertheless, for the reasons set forth above, based on past judicial construction of Article III, §29 and the history of Article VIII, §17, which explicitly recognizes the applicability of Article III, §29 to this question, we are unable to agree with their conclusion.

There has been significant pressure on this office to place a constitutional seal of approval on the Act 1978-51 grants to flood victims on the theory that public policy *favors* an interpretation upholding the program. It is important, however, to note that for each dollar paid to an individual flood victim, that same dollar comes out of the pocket of the taxpayers of Pennsylvania. The concern with the payer as well as the receiver must be within the scope of the review. The constitutional bar against "charitable" or "benevolent" appropriations is just that recognition. The people have a legal right to be specifically and directly consulted before their tax dollars are used to fund direct charitable and benevolent payments to individuals. This was not done in this case. The permission sought of the voters related solely to the use of State tax dollars to obtain matching Federal funds and it was that proposition and no other which they approved.

It is therefore our opinion, and you are so advised, that you are not to approve payments under Act 1978-51.[10]

---

10. We have already advised you to accept applications under the act so that, in the event that a court of competent jurisdiction should hold that Act 1978-51 is constitutional, you will be in a position to implement the act.