**COMMON CAUSE OF PENNSYLVANIA,**
**Petitioner,**

v.

**COMMONWEALTH of Pennsylvania, and Thomas J. Ridge, Governor, and Catherine Baker Knoll, Treasurer, Respondents.**

Commonwealth Court of Pennsylvania.

Argued Sept. 13, 1995.

Decided Nov. 13, 1995.

Eric B. Schnurer, for petitioner.

Calvin R. Koons, Senior Deputy Attorney General, for respondent, Commonwealth of Pennsylvania.

Gregory E. Dunlap, Deputy General Counsel, for respondent, Thomas J. Ridge, Governor.

Richard D. Spiegelman, for intervenor, North Philadelphia Health System.

Joseph R. Podraza, Jr., and Geoffrey C. Jarvis, for intervenor, Biotechnology Foundation, Inc.

Before COLINS, President Judge, DOYLE, McGINLEY, SMITH, PELLEGRINI, FRIEDMAN and KELLEY, JJ.

COLINS, President Judge.

Before the Court is petitioner's motion for summary judgment or in the alternative

judgment on the pleadings in this original jurisdiction action, which challenges various aspects of the 1995–96 General Appropriation Act (GAA) as unconstitutional. The matter is before us on stipulated facts, which we set forth as an appendix to this opinion. Portions of this opinion are adopted from the August 1, 1995 opinion of the Chancellor.

## I. BACKGROUND

On July 19, 1995, petitioner Common Cause of Pennsylvania (Common Cause) filed a petition for review in the nature of a complaint in mandamus, equity and for declaratory relief in this Court's original jurisdiction. Counts 1 through 3 of the petition for review allege constitutional defects in the procedure by which the GAA was enacted (the procedural counts), while Counts 4 through 7 allege that certain individual appropriations contained in the GAA are constitutionally prohibited (the line item counts).

Common Cause filed an application for peremptory judgment and summary relief pursuant to Pa.R.C.P. No. 1098 and Pa. R.A.P. 1532(b), an application for preliminary injunction and declaratory relief pursuant to Pa.R.A.P. 1532(a), and an application for expedited consideration. This Court set a hearing on petitioner's various requests for preliminary relief, which was held on Thursday, July 27, 1995. By memorandum opinion and order dated August 1, 1995, President Judge Colins, sitting as Chancellor, denied peremptory judgment in mandamus and summary relief in the nature of declaratory judgment. The Chancellor also denied preliminary injunctive relief as to the procedural counts, but preliminarily enjoined respondents from disbursing any funds pursuant to the specific appropriations challenged in the line item counts. The Chancellor's August 1, 1995 order indicated the Court's intention to hear this matter on the merits on September 13, 1995, if an appropriate motion were then before the Court.

Following several additional proceedings before the Chancellor, which resulted in the grant of intervenor status to two additional parties, modification of the preliminary injunction in several respects, and denial of Respondent Governor Thomas J. Ridge's motion to reconsider or dissolve the preliminary injunction, petitioner filed the motion for summary judgment or in the alternative judgment on the pleadings which is currently before us. We note that the pleadings are now closed, the parties have stipulated to the facts and no cross-motions for summary judgment have been filed.

Summary judgment may be granted only in cases where there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. Pa.R.C.P. No. 1035(b); *Consumer Party of Pennsylvania v. Commonwealth*, 510 Pa. 158, 175, 507 A.2d 323, 331 (1986). Because Common Cause, the Governor and the Treasurer have stipulated to the facts, there are no factual disputes; thus we may proceed to examine the constitutional provisions at issue.[1]

## II. ALLEGED PROCEDURAL CONSTITUTIONAL VIOLATIONS

### A. CONSTITUTIONAL PROVISIONS

Common Cause asserts, in the procedural counts, that the manner of enactment of the GAA violated Article III, sections 1, 2, 3, 4, and 11 of the Pennsylvania Constitution. These sections provide as follows:

Section 1. No law shall be passed except by bill, and no bill shall be so altered or amended, on its passage through either House, as to change its original purpose.

Section 2. No bill shall be considered unless referred to a committee, printed for the use of the members and returned therefrom.

Section 3. No bill shall be passed containing more than one subject, which shall be clearly expressed in the title, except a general appropriation bill or a bill codifying or compiling the law or a part thereof.

Section 4. Every bill shall be considered on three different days in each House. All

---

1. Intervenor Biotechnology Foundation, Inc. asserts that material facts remain outstanding, thus precluding the entry of summary judgment at this state of the proceedings. We shall discuss the merits of these assertions in Part III(D) of this opinion.

amendments made thereto shall be printed for the use of the members before the final vote is taken on the bill and before the final vote is taken, upon written request addressed to the presiding officer of either House by at least 25% of the members elected to that House, any bill shall be read at length in that House. No bill shall become law, unless on its final passage the vote is taken by yeas and nays, the names of the persons voting for and against it are entered on the journal, and a majority of the members elected to each House is recorded thereon as voting in its favor.

Section 11. The general appropriation bill shall embrace nothing but appropriations for the executive, legislative and judicial departments of the Commonwealth, for the public debt and for public schools. All other appropriations shall be made by separate bills, each embracing but one subject.

## B. ENACTMENT OF THE 1995–96 GAA

The 1995–96 GAA was enacted as House Bill No. 1169 (HB 1169)[2]. As demonstrated by the stipulated facts, HB 1169, as originally introduced, was not a general appropriation bill, but rather was entitled "AN ACT Making appropriations from a restricted revenue account within the General Fund and from Federal augmentation funds to the Pennsylvania Public Utility Commission." With minor amendments, all germane to the Public Utility Commission (PUC) appropriation, HB 1169 was passed by the House of Representatives on March 21, 1995, after being considered on three different days.

HB 1169 then was referred to the Senate Appropriations Committee, which made further amendments, involving only the amount of money appropriated to the PUC. This version of HB 1169 was considered on three different days in the Senate and was passed on April 24, 1995. Because the version passed by the Senate differed from the House version, HB 1169 was returned to the House, and was referred to the House Rules

Committee. It is at this juncture that the alleged unconstitutional procedures began.

The House Rules Committee again amended HB 1169, and reported the bill with amendments on June 13, 1995. The amendments made by the House Rules Committee, however, encompassed considerably more than the appropriation to the PUC. Instead, the House Rules Committee converted HB 1169 into the GAA by inserting the entire state budget into the bill, while retaining the appropriation to the PUC. The bill in this form was passed by the House on June 14, 1995 by a vote of 126–77. Later that same day, the Senate also passed the amended bill by a vote of 30–20.

## C. ARGUMENTS

Common Cause asserts that HB 1169, as originally introduced, was not a general appropriation bill, but rather was a specific appropriation bill that was unconstitutionally amended during its enactment to become a general appropriation bill in violation of Article III, sections 3 and 11. Common Cause argues that this procedure also violates Article III, section 1, in that HB 1169 was amended or altered during its passage so as to change its original purpose.

Because HB 1169, after its substantial amendment in the House Rules Committee, was not subsequently referred to committee in either chamber, Common Cause argues that Article III, section 2 has been violated. Furthermore, because HB 1169 was not *again* considered on three different days after its amendment by the House Rules Committee, Common Cause asserts a violation of Article III, section 4.

In the alternative, Common Cause contends that if the *original* version of HB 1169 can be construed to be a "general appropriation bill," so as to avoid the above-detailed constitutional infirmities, the bill would have to be stricken as violative of Article III, section 3, because the original title was narrowly limited to appropriations to the PUC from a restricted account, which, Common

---

**2.** In this opinion, we shall refer to the enacted General Appropriation Act as the GAA. We shall refer to prior versions of the bill as it appeared during the course of its passage through the legislature as HB 1169.

Cause urges, does *not* clearly express the subject of the bill as a general appropriations bill.

The Treasurer, represented by the Attorney General[3], contends that, given the strong presumption of constitutionality of legislative acts, Common Cause has not met its burden of showing that it is entitled to judgment as a matter of law. The Treasurer further argues that the procedure by which the GAA was enacted did not violate the relevant constitutional provisions. Specifically, the Treasurer asserts that the House Rules Committee's amendment inserting the entire GAA into a bill previously containing only an appropriation to the PUC did not substantially change either the title or the subject matter for the purposes of Article III, sections 1 and 3. The Treasurer contends that if these constitutional provisions were not violated, then the remaining provisions cited by Common Cause would not have been violated.

### D. JUSTICIABILITY

■ Initially, we agree that the GAA, as with all legislative enactments, is entitled to a strong presumption of constitutionality. 1 Pa.C.S. § 1922(3); *Snider v. Thornburgh,* 496 Pa. 159, 436 A.2d 593 (1981). The courts have abstained from consideration of many perceived procedural irregularities under the enrolled bill doctrine, which, as explained in *Kilgore v. Magee,* 85 Pa. 401, 412 (1877), states that:

> [W]hen a law has been passed and approved and certified in due form, it is no part of the duty of the judiciary to go behind the law as duly certified to inquire into the observance of form in its passage.... The presumption in favor of regularity is essential to the peace and order of the state.

While the enrolled bill doctrine operates an appropriate exercise of judicial restraint to avoid intrusion by the judiciary into the prerogatives of a co-equal branch of government, the Treasurer recognizes that such abstention is dependent upon the situation presented. As our Supreme Court stated in *Consumer Party v. Commonwealth,* 510 Pa. 158, 178, 507 A.2d 323, 333 (1986):

> While it is appropriate to give due deference to a co-equal branch of government as long as it is functioning within constitutional constraints, it would be a serious dereliction on our part to deliberately ignore a clear constitutional violation.

The court went on to state that:

> We agree with the Attorney General that we must not inquire into every allegation of procedural impropriety in the passage of legislation. However, where the facts are agreed upon and the question presented is whether or not a violation of a mandatory constitutional provision has occurred, it is not only appropriate to provide judicial intervention, and if warranted a judicial remedy, we are mandated to do no less. In this case where the facts are stipulated we agree with appellants that judicial scrutiny is required.

*Id.* at 180, 507 A.2d at 334. Accordingly, we shall proceed to analyze the procedure employed by the Legislature in the passage of the GAA to determine whether it complies with the mandates of Article III.

### E. CHANGE OF PURPOSE, ARTICLE III, SECTION 1

We begin with Article III, sections 1 and 3. Article III, section 3, the "single-subject" requirement, provides that no bill shall contain more than one subject, which shall be clearly expressed in the title of the bill. Notably, however, Article III, section 3 further provides an express exception for a general appropriation bill. Article III, section 1 provides that no bill shall be so altered or amended as to change its original purpose. Our Supreme Court has determined that the requirements of Article III, section 1 are mandatory. *Consumer Party,* 510 Pa. at 179, 507 A.2d at 334.

The Treasurer cites numerous cases in which the single-subject mandate of Article III, section 3 as well as Article III, section

---

**3.** We note that counsel for the Governor and the Treasurer agreed that the Treasurer's counsel would brief and argue the procedural counts, while the Governor's counsel would brief and argue the line item counts. Each party, however, joins in the argument made by the other.

1's prohibition on changing the purpose of a bill have been broadly construed. For example, in *Consumer Party,* the challenged bill, as originally introduced, dealt with changes in laws relating to counties of the third through eighth class. Similar to the GAA now at issue, the bill was approved by the Senate and further approved by the House with amendments, still bearing the same title. A Committee on Conference, however, recommended substantial amendments to the bill, adding voluminous provisions relating to the salaries and compensation of certain public officials. Both the House and the Senate adopted the Conference Committee bill on the day of its submission.

Our Supreme Court affirmed the Commonwealth Court's determination that the change did not violate Article III, section 1. Chief Justice Nix, writing for a unanimous Court[4], spoke of the need for legislative discretion, stating that:

> The practice of sending legislation to a conference committee is by its nature designed to reach a consensus [citation omitted]. It is therefore to be expected that the legislation that emerges from such a process may materially differ from the bills sent to the Committee for consideration. To unduly restrict this process would inhibit the democratic process in its traditional method of reaching accord and would unnecessarily encumber the heart of the legislative process, which is to obtain a consensus. Here there was no change in the bill's purpose after it left the Committee and that object was clearly stated in the new title. Indeed, the parties stipulate that the purpose did not change after the bill left the Committee and while it was presented for final passage before both houses. As noted by the Commonwealth Court:
>
>> The Consumer Party does not allege that any members were deceived as to the contents of the bill, making them unable to vote on it with circumspection. There is no submission by the Consumer Party that any part of the measure was secret [citation omitted].

The expansive interpretation urged by appellants would suggest that any material change in a piece of legislation during its passage would cause it to be constitutionally suspect. Such an interpretation would be incompatible with the traditional legislative process. We have said that the purpose sought to be achieved by Article III, section 1 was to put the members of the General Assembly and others interested on notice so that they may act with circumspection. Scudder v. Smith [331 Pa. 165, 200 A. 601 (1958) ]. Here the bill in final form, with a title that clearly stated its contents was presented to each house for its consideration and adoption. Under these circumstances there is no basis for sustaining a challenge under Article III, section 1.

510 Pa. at 181, 507 A.2d at 334–35.

The Treasurer argues that the process challenged in *Consumer Party* is virtually on all fours with the procedure that took place in the enactment of the 1995–96 GAA. Common Cause, while agreeing that the procedures employed are nearly identical, contends that the fact that the amendment involved the GAA as opposed to substantive legislation is a critical distinction. Indeed, neither the cases cited by the parties nor our research has revealed a case involving an Article III, section 1 or 3 challenge to a general appropriation act.

Article III, section 11 provides that a "general appropriation act shall embrace nothing but appropriations for the executive, legislative and judicial departments of the Commonwealth, for the public debt and for public schools." Section 11 further provides that "[a]ll other appropriations shall be made by separate bills, each embracing but one subject." It is clear that Article III, section 11 restricts the legislature's discretion in enacting a general appropriation act. We have held, for example, that Article III, section 11 prohibits the legislature from placing "substantive language" in a general appropriation act. *Cedarbrook Nursing Homes v. Department of Public Welfare,* 154 Pa.Cmwlth. 1, 622 A.2d 401 (1991) (administrative agency

---

4. Justice Hutchinson filed a separate concurring opinion, in which Justice Papadakos joined. Both justices, however, also joined in the Chief Justice's majority opinion.

order affirmed by equally divided Court), *aff'd* 533 Pa. 307, 622 A.2d 282 (1991); *Wesbury United Methodist Community v. Department of Public Welfare*, 142 Pa.Cmwlth. 353, 597 A.2d 271 (1991), *aff'd per curiam* (Larsen, J. dissenting), 533 Pa. 85, 619 A.2d 1057 (1993).

Therefore, unlike non-appropriation bills, we have held that Article III, section 11 imposes certain unique strictures on the legislature when enacting a general appropriation act. In fact, our Supreme Court has recognized that the "evils attendant" in excluding general appropriation bills from the single subject requirement of Article III, section 3 are minimized by the restrictions imposed by Article III, section 11 upon the content of such bills. *Commonwealth v. Barnett*, 199 Pa. 161, 48 A. 976 (1901). As Justice Mitchell explained in *Barnett*:

> [B]ills, popularly known as "omnibus bills," became a crying evil, not only from the confusion and distraction of the legislative mind by the jumbling together of incongruous subjects, but still more by the facility they afforded to corrupt combinations of minorities with different interests to force the passage of bills with provisions which could never succeed if they stood on their separate merits. So common was this practice that it got a popular name, universally understood, as logrolling. A still more objectionable practice grew up of putting what is known as a "rider," that is, a new and unrelated enactment or provision on appropriation bills, and thus coercing the executive to approve obnoxious legislation, or bring the wheels of the government to a stop for want of funds.
>
> These were some of the evils which the [1874] changes in the constitution were intended to remedy. Omnibus bills were done away with by the amendment of 1864 that no bill shall contain more than one subject, which shall be clearly expressed in the title. But this amendment excepted appropriation bills, and as to them the evil

still remained. The convenience, if not the necessity, of permitting a general appropriation bill containing items so diverse as to be fairly within the description of different subjects was patent. The [1874] constitution meets this difficulty—First, by including all bills in the prohibition of containing more than one subject, except "general appropriation bills" (article 3, § 3); secondly, by the provision that "the general appropriation bill shall contain nothing but appropriations for the ordinary expenses of the executive, legislative, and judicial departments of the commonwealth, interest on the public debt, and for public schools; all other appropriations shall be made by separate bills each embracing but one subject" [presently, Article III, section 11]; and thirdly, by the grant to the governor of [veto power pursuant to Article IV, section 16].

199 Pa. at 172, 48 A. at 977.

It is apparent, then, that Article III section 11 was intended to *restrict* the power of the legislature as a trade-off for the provision in Article III, section 3 which excludes a general appropriation bill from the single subject requirement. Because a general appropriation bill of necessity contains multiple subjects, the Article III, section 3 exclusion was a practical necessity. However, the potential for legislative abuse was limited by requiring that such bills contain *only* appropriations in the five areas by Article III, section 11.

Under this interpretation, we must agree with Common Cause that the metamorphosis of a bill originally containing *only* an appropriation from a restricted account in the general fund to the PUC into the GAA violated Article III, section 1. Numerous provisions of our Constitution are addressed to specific types of legislation that *may* be enacted by the General Assembly[5], while others mandate the passage of certain substantive legislation but provide neither ex-

---

5. *See* Article III, section 18 (the General Assembly *may* enact laws requiring the payment of worker's compensation benefits); Article III, section 19 (the General Assembly *may* make appropriations of money to institutions for certain widows and orphans); Article III, section 20 (the

General Assembly *shall have power* to classify municipalities according to population and pass laws relating to those classes); Article III, section 21 (laws *may* be passed providing for a system of land title registration).

press contents nor time limits within which such passage must occur.[6] General appropriation acts, however, stand alone, for Article III, section 11 expressly lists the types of appropriations which may be contained in this uniquely essential legislative enactment to the exclusion of all others.[7]

■ Put another way, the judiciary is normally loathe to substitute its judgment for that of the legislative branch under the guise of determining whether the constitutional "purpose" of a bill has changed during the course of its passage through the legislative process. The "purpose" of a general appropriation act, however, is constitutionally defined by Article III, section 11, and the legislature is bound by that definition. When, as here, the constitutional bounds are exceeded, the judiciary must grant appropriate relief.

### F. ARTICLE III, SECTIONS 2 and 4

■ Because we conclude that the enactment of the GAA violated Article III, section 1, we must also agree that the legislature violated Article III, sections 2 and 4. After the insertion of the GAA into HB 1169, it has been stipulated that the bill was neither referred to committee as required by Article III, section 2, nor was it considered in each house on three separate days, as mandated by Article III, section 4. In *Parker v. Department of Labor and Industry*, 115 Pa. Cmwlth. 93, 540 A.2d 313, 328 (1988), we adopted the rule followed by other jurisdictions in relation to whether or not an amended bill need be referred to committee and considered on three separate days. We concluded that it did not, *if the amendments are*

germane to, and do not wholly change, the general subject of the bill. Since we have already determined that the legislature in fact *did* materially alter or amend the original bill by the insertion of the GAA in violation of Article III, section 1, we also conclude that such procedure also violated Article III, sections 2 and 4.

### G. SINGLE SUBJECT—ARTICLE III, SECTION 3

■ Finally, we also agree that the GAA, as enacted, violates Article III, section 3. The appropriation to the PUC, which constituted the original version of HB 1169, remained in the final GAA. The PUC assesses public utilities under its jurisdiction for the regulatory expenses of the PUC pursuant to 66 Pa.C.S. § 510. These assessments are paid by the PUC into the General Fund through the Department of Revenue. 66 Pa.C.S. § 511(a). As required by 66 Pa.C.S. § 511(b):

> All such assessments and fees, having been advanced by public utilities for the purpose of defraying the cost of administering this part, *shall be held in trust solely for that purpose, and shall be earmarked for the use of and annually appropriated to,* the commission for disbursement solely for that purpose.

In *Commonwealth ex rel. Bell v. Powell,* 249 Pa. 144, 94 A. 746 (1915), the Treasurer refused to make payments upon requisition of the state highway commissioner based on the Treasurer's belief that a statute setting up a special fund for highway construction was unconstitutional.[8] The Treasurer based

---

6. *See* Article III, section 17 (the General Assembly *shall* prescribe by law the number, duties and compensation of the officers and employees of each House); Article III, section 22 (the General Assembly *shall* maintain by law a system of competitive bidding for the purchase of materials used by the state government).

7. Justice Mestrezat, dissenting in *Barnett*, observed that appropriations bills

> [A]re the only ones which may contain "more than one subject." As the school appropriation is, by the constitution, required to be embraced in the general appropriation bill, it is "one subject" of the many that the bill may contain.

*Barnett*, 199 Pa. at 191, 48 A. at 985 (Mestrezat, J., dissenting).
Our analysis today is that the GAA, while exempt from the single-subject requirement of Article III, section 3, is prohibited from containing anything other than the five "subjects" listed by Article III, section 11.

8. Section 10 of the Act of July 7, 1913, P.L. 782, repealed by the Act of June 30, 1919, P.L. 678, provided that:

> The moneys derived from registrations and from license fees under the provisions of this act shall be paid by the State Highway Department into the State Treasury for safe-keeping; and shall be placed in a separate fund, to be

this contention on Article III, section 3 and Article III, section 11 (then section 15). The Supreme Court rejected that single-subject challenge, concluding that a mechanism for the disposition of license fees collected was germane to the purpose of the entire act. The Supreme Court also rejected the section 11 challenge, stating that:

> [Article III, section 15, now section 11] of the Constitution was only intended to apply to the biennial appropriations made by the legislature out of the general revenues of the Commonwealth. It has no application to a fund created for a special purpose and dedicated by the act under which such fund is to be created to a particular use.

249 Pa. at 154, 94 A. at 749.

Common Cause cites to several cases decided subsequent to *Powell*, also dealing with special funds. We find these cases to be distinguishable, in that the funds at issue, each created by a substantive statute, were held not to constitute "appropriations" at all. *See Heuchert v. State Harness Racing Commission*, 403 Pa. 440, 170 A.2d 332 (1961); *Dufour v. Maize*, 358 Pa. 309, 56 A.2d 675 (1948); *Commonwealth v. Perkins*, 342 Pa. 529, 21 A.2d 45 (1941).

■ The Public Utility Code, 66 Pa.C.S. § 511, speaks of an annual "appropriation" to the PUC. It is, we believe, rather disingenuous to argue that the required statutory appropriation is not also a constitutional appropriation. This statutory scheme is distinct from the continuing appropriation discussed in *Powell* and the various "special funds" set up in *Heuchert, Dufour* and *Perkins*. Nonetheless, the fact that the moneys are "earmarked" for a specific purpose and are to be appropriated solely for that purpose leads us to conclude that the PUC appropriation is not properly part of the GAA, but rather one of "all other appropriations" which shall be made by separate bills, each embracing but one subject pursuant to Article III, section 11. Our conclusion is supported by the practice of the legislature itself. We take judicial notice that, since at least 1983, all annual appropriations required by 66 Pa.C.S. § 511(b) have been by separate bills.[9]

### H. REMEDY

In summary, we hold that the enactment of the GAA violated Article III, sections 1, 2, 3, 4 and 11 of the Pennsylvania Constitution and therefore Common Cause is entitled to summary judgment as a matter of law as to Counts 1 and 3 of its petition for review.[10] We shall now discuss the relief to which Common Cause is entitled.

■ As mentioned earlier, Common Cause requested relief in mandamus, declaratory judgment and equity. As the Chancellor correctly pointed out, mandamus may *not* be used to direct retraction or reversal of an action already taken by an official in good faith and in the exercise of legitimate jurisdiction. *Campbell v. Rosenberger*, 159 Pa.

---

available for the use of the State Highway Department upon requisition of the State Highway Commissioner. All such moneys hereafter paid into the State Treasury are hereby specifically appropriated to the State Highway Department, for the purpose of assisting in the construction, maintenance, improvement, and repair of State Highways and State-aid Highways, as described in the act creating the State Highways Department, approved the thirty-first day of May, Anno Domini one thousand nine hundred and eleven. The Auditor General shall upon requisition, from time to time, of the State Highway Commissioner, draw his warrant upon the State Treasurer for the amount specified in such requisition, not exceeding, however, the amount in such fund at the time of making such requisition.

9. *See* Act of July 22, 1983, Act 1983–8A, Senate Bill No. 876; Act of June 28, 1984, Act

1984–5A, House Bill No. 1919; Act of April 18, 1985, Act 1985–3A, House Bill No. 109; Act of July 1, 1986, Act 1986–6A, House Bill No. 2090; Act of June 15, 1987, Act 1987–4A, House Bill No. 208; Act of July 6, 1988, Act 1988–8A, House Bill No. 2196; Act of July 1, 1989, Act 1989–4A, House Bill No. 537, Act of July 1, 1990, Act 1990–9A, House Bill No. 2312; Act of August 4, 1991, Act 1991–12A, House Bill No. 547; Act of June 30, 1992, Act 1992–10A, House Bill No. 2467; Act of June 2, 1993, Act 1993–3A, House Bill No. 607; Act of July 1, 1994, Act 1994–7A, House Bill No. 2624.

10. Because we hold in favor of Common Cause on Counts 1 and 3, we need not consider the alternative theory presented in Count 2 of the Petition for Review.

Cmwlth. 321, 632 A.2d 1094 (1993); *Matesic v. Maleski*, 155 Pa.Cmwlth. 154, 624 A.2d 776 (1993). Accordingly, Common Cause is not entitled to relief in mandamus.

■ Similarly, we agree with the Chancellor that equitable relief in the form of a permanent injunction should not properly be granted as to the entire GAA. Moneys appropriated in the GAA for the operation of the Commonwealth government are expended on a daily basis. More than four months have now passed since the effective date of the GAA, and, if not enjoined by this Court, the payments for the day-to-day operations of the Commonwealth government will continue to be made as authorized by the GAA until June 30, 1996. Included in these day-to-day expenses are payments to individuals and payment for necessary governmental functions. No immediate purpose would be served by enjoining these essential payments, but rather, such an order would produce chaos in state government with the immediate potential to harm the citizenry of the Commonwealth.

■ We also agree, as the Chancellor pointed out, that Common Cause, as well as all citizens, would be irreparably harmed if unconstitutional acts were allowed to continue unabated. However, as the Chancellor recognized, the Court is capable of fashioning other relief tailored to address the harm incurred.[11] The harm identified is that which may flow from the General Assembly's failure to follow express constitutional procedures applicable to the enactment of the GAA.[12] Common Cause, however does not allege the actual occurrence of these egregious 19th-century practices, but merely asserts that, absent strict adherence to the provisions of the Constitution, the potential for that occurrence remains. Therefore, we believe that the appropriate relief is the entry of a prospective declaratory judgment.

We are aware that our decision casts doubt upon the longstanding legislative practice of amending a GAA into an unrelated bill used as a "vehicle." We are further aware that requiring strict adherence to the specific procedural provisions contained in Article III will no doubt make the process of legislating more time consuming. In our view, however, the framers of our constitution did not envision that a complete and detailed budget could simply be agreed upon by legislative leaders behind closed doors and inserted as a *fait accompli* into any bill that happened to be so positioned in the legislative process so as to serve for a "vehicle" for the budget. Instead, we believe that the framers intended that a bill bearing the title of a GAA should be introduced, referred to committee and

11. Common Cause has suggested the possibility of a limited injunction tailored to permit the continued payment of many of the necessary expenses of Commonwealth government, citing as authority *Knoll v. White*, 141 Pa.Cmwlth. 188, 595 A.2d 665 (1991) (ordering continued payment of certain federally-mandated entitlements despite fact that no budget had been adopted) and *Council 13, American Federation of State, County and Municipal Employees, AFL–CIO v. Casey*, 141 Pa.Cmwlth. 199, 595 A.2d 670 (1991) (granting peremptory mandamus to compel the issuance of paychecks to certain state employees despite fact that no budget had been adopted.)

While we recognize that these cases may authorize the type of tailored injunction suggested by Common Cause, we continue to believe that the issuance of even such a limited injunction would create greater harm then would be remedied.

12. The Honorable Robert E. Woodside, a noted state constitutional scholar, summarized the evils intended to be remedied by the framers of the 1874 Pennsylvania Constitution as follows:

The General Assembly and its enactment of laws was substantially changed in the Constitution of 1874. Prior to that time, nearly 95% of the statutes passed were special or local acts doing such things as: granting divorces and annulments to specific couples, opening and closing an alley in a particular borough, changing the venue of a specific case, granting profit and non-profit corporations to individuals to operate banks and all kinds of associations, granting a right to operate a ferry at Millersburg, annexing a particular farm to a borough, appropriating a substantial sum of money to an individual for his raising troops during the Civil War.

The procedure not only opened the door to log rolling, favoritism, and even bribery, but made them a way of legislative life. Most of the evils which existed in the General Assembly of Pennsylvania and in the Congress of the United States were examined with the idea of correcting them in the new Constitution. The result is found in the required method of enacting legislation contained in Article III.

Robert E. Woodside, *Pennsylvania Constitutional Law* at 295 (1985).

considered on three different days in each chamber, and in the process not amended to change its original purpose, thus ensuring both opportunity for public scrutiny as well as full legislative participation.[13]

## III. THE LINE ITEM APPROPRIATIONS

### A. CONSTITUTIONAL PROVISIONS

In the line item counts, Common Cause argues that, irrespective of whether the procedure utilized by the General Assembly was proper, certain appropriations contained in the GAA must be stricken because they are prohibited by Article III, sections 3, 11, 29 and 30. Sections 29 and 30 of Article III provide as follows:

Section 29. No appropriation shall be made for charitable, educational or benevolent purposes to any person or community nor to any denominational and sectarian institution, corporation or association: Provided, That appropriations may be made for pensions or gratuities for military service and to blind persons twenty-one years of age and upwards and for assistance to mothers having dependent children and to aged persons without adequate means of support and in the form of scholarship grants or loans for higher educational purposes to residents of the Commonwealth enrolled in institutions of higher learning except that no scholarship, grants or loans for higher educational purposes shall be given to persons enrolled in a theological seminary or school of theology.

Section 30. No appropriation shall be made to any charitable or educational institution not under the absolute control of the Commonwealth, other than normal schools established by law for the professional training of teachers for the public schools of the State, except by a vote of two-thirds of the members elected to each House.

Common Cause cites to some 150 line item appropriations in the GAA that are asserted to constitute prohibited appropriations, in part because they violate Article III, sections 3 and 11 (appropriating money for other than the operating budgets of the three branches of Commonwealth government, the public debt and the public schools). While Common Cause does not necessarily contend that money cannot be appropriated to these entities, it asserts that appropriations of this type can be made, if at all, only by "separate bills, each embracing but one subject," as required by Article III, section 11, *and* subject to the prohibitions of Article III, Sections 29 and 30.

The Chancellor, in his August 1, 1995 opinion and order, granted preliminary injunctive relief as to the challenged line items, which was subsequently modified as to certain entities.[14]

### B. ARGUMENTS

Common Cause asserts that the inclusion of a multitude of grants or appropriations to

13. A "vehicle" bill, if one is utilized at all, must be germane to the five subjects constitutionally authorized to be contained in a GAA by Article III, section 11.

14. By orders dated August 11, 1995, the Chancellor granted (1) Common Cause's Motion to Amend Pleadings and Modify Injunction so as to strike from the petition for review and exclude from the preliminary injunction an appropriation in the amount of $35,675,000 for Institutional Assistance Grants to be allotted by the Pennsylvania Higher Education Assistance Agency, § 229 of the GAA; (2) the Motion to Modify Injunction of Intervenor North Philadelphia Health Systems excluding from the preliminary injunction an appropriation in the amount of $4,400,000 to the Department of Public Welfare for the North Philadelphia Health Systems, § 220 of the GAA; and (3) the Motion to Modify Injunction of Intervenor Biotechnology Foundation, Inc. excluding from the preliminary injunction an appropriation in the amount of $1,250,000 to the Department of Health for the Biotechnology Foundation, § 216 of the GAA.

By order dated August 23, 1995, the Chancellor denied the motion of Governor Ridge to dissolve the August 1, 1995 preliminary injunction, but granted further modification by excluding from the preliminary injunction appropriations of (1) $70,000 to the Great Lakes Commission and the Great Lakes Council of Governors, § 206 of the GAA; (2) $83,000 to the Education Commission of the States, § 206 of the GAA; (3) $242,000 to the Department of Commerce for payment of the Commonwealth's share of the costs of the operation of the Appalachian Regional Commission and the Office of the Appalachian States' Regional Representative, § 209 of the GAA; and (4) $100,000 to the Department of Transportation for the Wheeling and Lake Erie Right-of-Way Environmental Study, § 223 of the GAA.

entities not under the absolute control of the Commonwealth contravenes explicit constitutional prohibitions that were intended to prevent dispensing largesse from the public purse without careful and public consideration by the General Assembly. Common Cause contends that the constitutional scheme permits only "appropriations for the executive, legislative and judicial department of the Commonwealth, for the public debt and for public schools" to be included in a general appropriation bill. Article III, Section 11. "All other appropriations shall be made in separate bills, each embracing but one subject." Article III, Section 11.

Additionally, appropriations to charitable or educational institutions not under the absolute control of the Commonwealth are prohibited except by a two-thirds vote of all the members elected to each House. Article III, Section 30. Other appropriations for charitable, educational or benevolent purposes to "any person or community," "denominational and sectarian institution, corporation or association" are proscribed with certain limited exceptions not relevant here. Article III, Section 29.

The Governor argues that in fact *no* appropriation has been made in violation of the relevant constitutional provisions because all of the appropriations in the GAA are to agencies of the executive branch of the Commonwealth government, in compliance with Article III, Section 11.

### C. DISCUSSION (FROM AUGUST 1, 1995 OPINION OF THE CHANCELLOR)

We agree with the reasoning of the Chancellor's August 1, 1995 opinion relating to the line item counts, which we reiterate here.

Our Supreme Court has held the intent of Article III, Section 29 to be "to forbid the state from giving, *either directly or indirectly,* any recognition to a religious sect or denomination, even in the field of public charity and education...." *Collins v. Kep-*

*hart,* 271 Pa. 428, 117 A. 440 (1921). At issue in *Collins* were five consolidated appeals relating to appropriations to five separate institutions, all of which were alleged to violate the proscription in Article III, Section 29 relating to sectarian or denominational institutions.[15]

The suits were first brought by an individual against Harmon M. Kephart, State Treasurer, and others in the court of common pleas of Dauphin County seeking to enjoin payment of moneys appropriated. The common pleas court dismissed the suits, and the Supreme Court, on appeal, reversed. Chief Justice Moschzisker noted that "[w]hen simple words are used in writing the fundamental law, they must be read according to their plain, generally understood meaning." *Id.* at 434, 117 A. at 442. The Chief Justice further noted that a long-standing tradition of appropriating such moneys was of no moment, stating that

> [L]ong persistence in a breach of the Constitution neither warrants the course pursued nor gives it legality. The other two departments of government, in making and passing on appropriations of the character before us, generally consider questions of right and expediency alone, leaving constitutional points to the courts; but, when the latter come here for determination, our duty is plain, we must follow and enforce the organic law as written, suffer who may.

*Id.* at 434–35, 117 A. at 442 (citations omitted).

Finally, Chief Justice Moschzisker recognized that the courts

> [A]re always loathe to put a construction on legislation which shows it to be invalid (citation omitted); but, if Constitutions are to command general respect and obedience, the people must know that their courts will constantly endeavor to interpret them according to the commonly accepted understanding of the words used therein;

---

15. The institutions at issue were the Passavant Hospital of Pittsburgh, St. Timothy's Memorial Hospital and House of Mercy located in the Roxborough section of Philadelphia, Duquesne University of the Holy Ghost in Pittsburgh, the Dubois Hospital Association, owned and operated by the Sisters of Mercy of Crawford and Erie Counties, and the Jewish Hospital Association of Philadelphia. The language currently found in Article III, Section 29 was, at the time, found in Article III, Section 18.

and, when this rule is applied to the facts before us, the result is inevitable.

*Id.* at 441, 117 A. at 444.

Four years after the decision in *Collins v. Kephart,* the Supreme Court again had occasion to consider Article III, Section 29 (then Section 18), in *Busser v. Snyder,* 282 Pa. 440, 128 A. 80 (1924). At issue in that case was an act of the General Assembly entitled the Old Age Assistance Act of May 10, 1923, P.L. 189, which, *inter alia,* established a commission to assist certain elderly persons who met statutory criteria. In the face of a constitutional challenge as a prohibited charitable or benevolent appropriation to "any person or community," the Commonwealth argued that the original purpose of the prohibition was

> (1st) to prevent appropriations on account of border raids and other calamities happening within the limits of the Commonwealth, because of the drain on the treasury; (2d) to stop the notorious corruption practiced in securing the passage of these act; (3d) to prevent unfair discrimination in dispensing such benevolences and charities as between persons and communities; (4th) finally, the legislature could not investigate the merits of these claims.

*Id.* at 450, 128 A. at 83.[16]

The Commonwealth argued in 1924, as it does now, that the appropriations were constitutional because they were not made "to any person or community," but rather to a governmental agency, even though the ultimate object may be to give to persons prohibited from receiving the money thus appropriated. *Id.* at 451, 128 A. at 84.[17]

Justice Kephart, writing for a unanimous Supreme Court, concluded that the Common-

wealth's contentions were not sound, stating that

> The language of the Constitution is an absolute and general prohibition. *Nor does the fact that the appropriation is made to an agency* (the intermediate and practical step by which public money is distributed to citizens) *aid appellant's case. The gift is not to the commission, but to the particular persons selected by the legislature to receive it. The commission cannot use the money; it merely passes it on to the selected class. It is nonetheless a gift directly to the individual, even though it pauses for a moment on its way thither in the hands of the agency.* Nor can the act be sustained because the appropriation is to an agency as an arm of the government, working out a governmental policy. What the Constitution prohibits is the establishment of any such policy which causes an appropriation of state moneys for benevolent purposes to a particular class of its citizens, *whether under the guise of an agency, as an arm of the government through which a system is created, or directly to the individual.* As said by the court below, *this proposition "is tantamount to saying the legislature can pass a law to do the thing indirectly which the Constitution prohibits it from doing directly."* If this can be done, the Constitution imposes no restraint on the expenditure of money.

*Id.* at 451–52, 128 A. at 84 (emphasis supplied).

Despite the strong pronouncements of our Supreme Court in these two cases, the Governor argues that subsequent cases have sub-

---

**16.** We note that Article III, Section 29 (formerly Section 18) was amended in 1937 to specifically allow "assistance to mothers having dependent children and to aged persons without adequate means of support." Therefore, the bill at issue in *Busser v. Snyder* would most likely be held constitutional under the current language of Article III, Section 29.

**17.** The Attorney General, in his brief submitted to the Court of Common Pleas of Dauphin County, Commonwealth Docket (the predecessor to the Commonwealth Court), argued that:

> Not a syllable in the State or Federal constitutions forbids the legislature to provide for a system of benevolence through a State Department or agency for the care and maintenance of its aged indigent residents.

*Busser v. Snyder,* 27 Dauph. 231, 237 (C.P.Pa. 1924)

President Judge Hargest responded to this argument by stating that "[i]f appropriations can be made to a commission the purpose of which is to distribute benevolence to aged indigent persons, it is accomplishing exactly what the Constitution says cannot be done, namely, making an appropriation for benevolent purposes to certain persons." *Id.* at 238.

stantially modified these holdings. The cases cited by the Governor have held that payment for the performance of a *governmental duty* do not fall within the constitutional proscriptions. *See Commonwealth ex rel. Schnader v. Liveright*, 308 Pa. 35, 161 A. 697 (1932) (payments for the support of the poor constitute governmental duty); *Schade v. Allegheny County Institution District*, 386 Pa. 507, 126 A.2d 911 (1956) (payments to secular institutions for the care of children committed by the juvenile court constitute governmental duty); *Springfield School District, Delaware County v. Department of Education*, 483 Pa. 539, 397 A.2d 1154 (1979) (payments for busing students to sectarian institutions do not constitute an appropriation as purpose is to protect safety of students); *Pennsylvania Association of State Mental Hospital Physicians v. Commonwealth*, 63 Pa.Cmwlth. 307, 437 A.2d 1297 (1980) (payments made to a non-governmental entity in the performance of a governmental duty by an agency of the Executive branch are not appropriations in the constitutional sense).

■ We believe, however, that these cases set forth an exception to the general constitutional rule that appropriations may not be made in a general appropriation bill to entities not under the absolute control of the Commonwealth, and that the challenged appropriations in the GAA do not fall within the exception. In the above-cited cases, a substantive statute clearly delineated the fact that the flow of money to the challenged entities was in the nature of reimbursement for services rendered by the entity for the purpose of performing a governmental duty. In stark contrast, most of the language accompanying the challenged appropriations in the GAA is merely a bald assertion that the money is "for community economic recovery," [18] or "for community conservation and employment." [19] If the Commonwealth respondents are correct that this type of appropriation falls within the "governmental duty" exception, then the exception will have truly swallowed the constitutional rule.

## D. REMEDY

As with the procedural counts, Common Cause has requested relief in mandamus, declaratory judgment and equity. Our discussion of the availability of mandamus to the procedural counts applies equally here. Accordingly, Common Cause is not entitled to relief in mandamus.

■ Declaratory relief in the form of a prospective declaratory judgment is as appropriate here as it is to the procedural counts. The legislature will be put on notice of this Court's determination that it has failed to follow constitutional procedure, together with our reasoning, in sufficient time so as to eliminate constitutional infirmities in appropriations.

■ Unlike the procedural counts, however, we find that equitable relief is appropriate to enjoin the line item appropriations. Contrary to the effect of enjoining the entire 1995–96 GAA, permanently enjoining the expenditure of unconstitutional appropriations is both necessary and appropriate. We must further explain, however, our view of exactly what is encompassed by this injunction.

Governor Ridge argues persuasively in his brief that the consequences of adopting the constitutional rule proffered by Common Cause would require the General Assembly to eliminate from the GAA all references to specific non-Commonwealth entities, programs and projects to which the legislature would wish Commonwealth agencies to target public resources in the performance of their governmental duties. This rule, according to the Governor, would hinder the General Assembly's ability to direct appropriations to specific governmental purposes, programs and locations. Brief of Governor Ridge in opposition to Summary Judgment at 28.

Common Cause, on the other hand, contends that the legislature is free to appropriate funds to specific purposes, programs and locations in the GAA so long as it does not attempt to earmark funds to specific *recipients* not under the absolute control of the

---

18. HB 1169, PN 2087 at 41.

19. HB 1169, PN 2087 at 46.

Commonwealth. Brief of Common Cause in support of Summary Judgment at 48.

Central to this dispute, and, we believe, essential to its resolution, is the distinction between an "appropriation" of money and payment of money appropriated to an ultimate recipient. "Appropriation" is defined as:

> The act by which the legislative department of government designates a particular fund, or sets apart a specified portion of the public revenue or of the money in the public treasury, to be applied to some general object of governmental expenditure, or to some individual purchase or expense....
>
> The legislative designation of a certain amount of money as being set aside, allotted, or assigned for a specific purpose....

Black's Law Dictionary at 102 (6th Ed., 1990).

> An "appropriation bill" is defined as:
>
> A measure before a legislative body authorizing the expenditure of public moneys and stipulating the amount, manner, and purpose of the various items of expenditure....

*Id.*

■ Thus, read in conjunction with Article III, section 11, the legislature may *authorize, designate, allot or set aside* moneys for any of the five purposes allowed by section 11, i.e., the executive, legislative and judicial departments of the Commonwealth, the public debt and public schools. It may do so with as much or as little particularity as it desires, and, may certainly designate specific "programs and projects to which the legislature would wish Commonwealth agencies to target public resources in the performance of their governmental duties," or "direct its appropriations to specific governmental purposes, programs and locations" as asserted by Governor Ridge.

■ What the General Assembly may *not* do in a general appropriation act, is *authorize, designate, allot or set aside* moneys, either directly or indirectly earmarked for specific entities not under the absolute control of the Commonwealth. In addition to violating Article III, section 11, such a designation would violate one of the central tenets of our system of government, separation of powers. The power to appropriate moneys lies exclusively with the legislative branch. Article III, section 24 of our constitution specifically provides that no money may be paid out of the State Treasury except upon appropriation made by law or, in cases of refunds, as provided by law. This Court has stated that, pursuant to Article III, section 24, money may be paid out of the State Treasury only by legislative action in the form of an appropriation act or in the form of other statutory enactment of general or limited application as to particular subjects. *Shapp v. Sloan,* 27 Pa.Cmwlth. 312, 367 A.2d 791, 797–98 (1976), *aff'd,* 480 Pa. 449, 391 A.2d 595 (1978). Such legislative action rests with the General Assembly, and it is within its exclusive power and authority to appropriate money out of the State Treasury or to otherwise provide for disbursements therefrom. *Id.* at 798. As Justice Manderino stated:

> It is fundamental within Pennsylvania's tripartite system that the General Assembly enacts the legislation establishing those programs which the state provides for its citizens and appropriates the funds necessary for their operation. The executive branch implements the legislation by administering the programs. See, e.g., *Stander v. Kelley,* 433 Pa. 406, 250 A.2d 474 (1969). It must do so within the requirements and restrictions of the relevant legislation, and within the amount appropriated by the legislature. The executive branch may not of its own initiative use funds appropriated for one program in carrying out another and may not spend on a program more than its designated amount. It is in this way that the doctrine of separation of powers functions.

*Shapp v. Sloan,* 480 Pa. 449, 468–69, 391 A.2d 595, 604 (1978) (Manderino, J. with two Justices concurring and one Justice concurring in the result), *appeal dismissed for want of a substantial federal question sub. nom. Thornburgh v. Casey,* 440 U.S. 942, 99 S.Ct. 1415, 59 L.Ed.2d 630 (1979) (Stevens, J. dissenting).

■ Therefore, while the legislature is free to *appropriate,* subject of course to the constitutional procedures and prohibitions, and is also free to legislatively determine, through substantive legislation, the purposes to which appropriated funds are to be devoted, the legislative branch may not micromanage the executive's power to administer appropriated funds by earmarking the non-governmental recipients thereof. As stated by the highest court of one of our sister states:

[The legislature] cannot administer the appropriation once it has been made. When the appropriation is made, its work is complete and the executive authority takes over to administer the appropriation to accomplish its purpose, subject to the limitations imposed.

*State ex rel Meyer v. State Board of Equalization and Assessment,* 185 Neb. 490, 176 N.W.2d 920, 926 (1970).

The Supreme Court of Colorado, interpreting a provision of that state's constitution, which is nearly identical to Article III, section 11,[20] adopted the reasoning of the Supreme Court of Nebraska stating that:

Thus, it follows that the general assembly is not permitted to interfere with the executive's power to administer appropriated funds, which includes the making of specific staffing and resource allocation decisions.

In addition, the legislature may not attach conditions to a general appropriation bill which purport to reserve to the legislature powers of close supervision that are essentially executive in character. We are confronted with such a legislative encroachment on the executive in the present case with respect to appropriations that are conditioned upon certain reports to or approval from the general assembly's Joint Budget Committee.

*Anderson v. Lamm,* 195 Colo. 437, 579 P.2d 620, 623 (1978).

Numerous other states have similarly construed their constitutions to hold that while the legislature is vested with the power to *appropriate,* that power may not unduly intrude on the spending prerogatives of the executive.[21]

■ Therefore, while we conclude that the legislature, in a general appropriation act, cannot *appropriate* money to private entities, either directly or through a state agency, the executive branch is free to lawfully *spend* moneys constitutionally appropriated to it. If, either pursuant to statute, contract, or under the "governmental duty" doctrine of *Commonwealth ex rel. Schnader v. Liveright,* 308 Pa. 35, 161 A. 697 (1932) and *Schade v. Allegheny County,* 386 Pa. 507, 126 A.2d 911 (1956), the executive branch chooses to spend funds with the result that these same private entities are the recipients thereof, such *expenditure* would be entirely proper.

■ Put another way, using the Chancellor's examples of two of the challenged line items, appropriations to the Department of Commerce "for community economic recovery,"[22] or to the Department of Community Affairs "for community conservation and em-

**20.** Article V, section 32 of the Colorado Constitution provides that:

The general appropriation bill shall embrace nothing but appropriations for the expense of the executive, legislative and judicial departments of the state, state institutions, interest on the public debt and for public schools.

**21.** *See In re Opinion of the Justices,* 129 N.H. 714, 532 A.2d 195, 197 (1987) ("Once the legislature has made an appropriation for the executive branch, the requirement of fiscal committee approval of contracts made pursuant thereto by the executive branch is an unconstitutional intrusion into the executive branch of government"); *Alexander, et al v. State,* 441 So.2d 1329, 1341 (Miss. 1983) ("Once taxes have been levied and appro-

priation made, the legislative prerogative ends and the executive responsibility begins...."); *State ex rel McLeod v. McInnis,* 278 S.C. 307, 295 S.E.2d 633, 637 (1982) ("[A]dministration of appropriations ... is a function of the executive department."); *State ex rel Schneider v. Bennett,* 219 Kan. 285, 547 P.2d 786, 797 (1976) (State Finance Council overseeing use of budget appropriations held to be an unconstitutional encroachment on the powers of the executive); *In re Opinion of the Justices to the Governor,* 369 Mass. 990, 341 N.E.2d 254, 257 (1976) ("[T]o entrust the executive power of expenditure to legislative officers is to violate [the mandated separation of powers] by authorizing the legislative department to exercise executive power").

**22.** HB 1169, PN 2087 at 41.

ployment" [23] are certainly valid governmental purposes falling within the ambit of legislative discretion to direct funding to specific programs. The constitutional infirmity, however, is that specific entities not under the absolute control of the Commonwealth such as the Beaver County Corporation for Economic Development, the United Way of Berks County, the Grove City YMCA, the State College Little League and Our Lady of Cavalry Senior Citizens, to name just a few, are specifically identified in the GAA as recipients for these funds. The Governor argues strenuously that the inclusion of such named entities does not invalidate the appropriation, as the entities will only *receive* money if they otherwise qualify under statute, contract or in some other lawful manner.[24]

The question of whether or not executive branch officials have independent statutory or contractual authority to *expend* the moneys appropriated to them is simply not relevant to the question before us today. Instead, the relevant query is whether the legislature had the authority to *designate* those funds to those specific entities. We hold that it did not. We agree with the Governor, however, that if any of the named entities otherwise qualifies for money in any lawful fashion, our injunction does not preclude it from receiving those funds. If, for example, the Secretary of Commerce validly enters into a contract with the Beaver County Corporation for Economic Development in the amount of $100,000, the money can lawfully be expended. Similarly, if the Secretary of Community Affairs determines that a statute authorizes the expenditure of $150,000 to the United Way of Berks County under the governmental duty doctrine, the money can lawfully be expended.

Intervenor Biotechnology Foundation asserts in its new matter that material facts remain outstanding as to the line item claims, and further that the petition for review must be dismissed for failure to join indispensable parties, i.e., the other entities identified as recipients of the challenged line item appropriations. While we agree that material facts remain outstanding as to whether governmental agencies have the authority to *expend* moneys to the entities named in the challenged line items, our discussion above demonstrates that these are not facts germane to the present action. The sole *relevant* material fact is that to which the parties have stipulated, that is, that the named entities are not under the absolute control of the Commonwealth. Similarly, while the named entities may have standing to challenge the decision of the appropriate executive officials as to whether or not to expend funds lawfully appropriated, we conclude that the entities to which unconstitutional appropriations have been earmarked in the GAA are not indispensable parties for the purpose of this action.[25]

In conclusion, we hold that Common Cause is entitled to summary judgment in the nature of a prospective declaratory judgment on both the procedural and the line item counts, and is further entitled to the entry of a permanent injunction as to the line item counts, as discussed in this opinion.

### ORDER

AND NOW, this 13th day of November, 1995, following argument on petitioner's Motion for Summary Judgment in the above-captioned matter, it is hereby ORDERED, in accordance with the opinion entered this day, that:

---

**23.** HB 1169, PN 2087 at 46.

**24.** Charitable or education institutions may, of course, receive moneys directly appropriated to them if such appropriation is by a vote of two-thirds of the members elected to each House pursuant to Article III, Section 30.

**25.** In so doing, we *recognize*, but decline to follow, the sole case on point cited by Biotechnology Foundation, *New York Association of*

*Plumbing–Heating–Cooling Contractors v. Egan*, 86 A.D.2d 100, 449 N.Y.S.2d 86 (1982), *aff'd on opinion of the appellate division*, 60 N.Y.2d 882, 470 N.Y.S.2d 367, 458 N.E.2d 826 (1983). Rather, we believe that Pennsylvania cases have held to the contrary. *See Grippo v. Dunmore School Board*, 27 Pa.Cmwlth. 507, 365 A.2d 678 (1976) (a designation of funds for some purpose does not create, in itself, any rights to those funds. Any right ... to payment must arise from a contract, not an appropriation).

1. Petitioner's Motion for Summary Judgment is GRANTED as to the Counts 1 and 3 of the Petition for Review. Petitioner's request for relief in the nature of mandamus and for permanent injunctive relief as to these counts, however, is DENIED. A prospective Declaratory Judgment is entered in favor of Petitioner and the procedure by which the 1995–96 General Appropriation Act was enacted is hereby declared to be violative of Article III, sections 1, 2, 3, 4 and 11 of the Pennsylvania Constitution.

2. Petitioner's Motion for Summary Judgment is GRANTED as to the Counts 4 through 7. Petitioner's request for relief in the nature of mandamus is DENIED. Declaratory Judgment is entered in favor of Petitioner and the appropriations to entities not under the absolute control of the Commonwealth are hereby declared to violate Article III, sections 11, 29 and 30 of the Pennsylvania Constitution.

3. Respondents Governor Thomas J. Ridge and Treasurer Catherine Baker Knoll are hereby permanently enjoined from expending any funds appropriated under the line items as listed in pages 14 through 26 of the petition for review to the entities named therein. Said entities, including Intervenors North Philadelphia Health Systems and Biotechnology Foundation, Inc. as well as potential intervenors, Commission on Economic Opportunity of Luzerne County and Western Pennsylvania Maglev Development Corporation, are *not* prohibited, under the injunction entered today, from receiving any state funding to which they may otherwise be entitled. Appropriations designated for the four entities named in this Court's August 23, 1995 Order (Great Lakes Commission and Great Lakes Council of Governors, Education Commission of the States, Appalachian Regional Commission and Office of Appalachian States' Regional Representative, Department of Transportation for the Wheeling and Lake Erie Right-of-way Environmental Study) as well $35,675,000 appropriated to the Pennsylvania Higher Education Assistance Agency, excluded by virtue of the Chancellor's August 11, 1995 grant of Petitioner's Motion to Amend Pleadings and Modify Injunction are specifically excluded from the permanent injunction.

4. The Petitions for Leave to Intervene filed by the Commission on Economic Opportunity of Luzerne County and Western Pennsylvania Maglev Development Corporation are hereby DISMISSED as moot.

## APPENDIX: STIPULATED FACTS

1. On March 14, 1995, Representatives Pitts and Evans introduced House Bill No. 1169 (hereinafter "HB 1169"), Printer's No. (PN) 1301, entitled "AN ACT Making appropriations from a restricted revenue account within the General Fund and from Federal augmentation funds to the Pennsylvania Public Utility Commission."

2. HB 1169, PN 1301 was 43 lines long and provided for $36.757 million in operating funds for the PUC from the restricted revenue account of the General Fund and $190,000 of Federal augmentation funds to enforce the regulations of the Natural Gas Pipeline Safety Act. The bill also contained a restriction on the PUC's use of federal funds, prohibiting their being "credited to any utility" or "used to lower the annual assessment of any utility." The bill further provided for an effective date for the legislation. There were no other provisions to the bill.

3. HB 1169 was amended before passage in the House of Representatives in only one respect, to wit; The state appropriation was raised from $36.757 million to $38.121 million. HB 1169, PN 1306.

4. HB 1169, PN 1306 was considered three times in the House and passed the House on March 21, 1995.

5. HB 1169 was amended in Senate committee on April 18, 1995, the sole amendment returning the listed amount to its original total of $36.757 million. HB 1169 was adopted in this form by the Senate. HB 1169, PN 1541.

6. HB 1169 was considered three times by the Senate and passed the Senate on April 24, 1995.

7. After amendment by the Senate, HB 1169 was returned to the House and referred to the House Committee on Rules.

8. HB 1169 was reported from the Committee on Rules on June 13, 1995, heavily amended, as Printer's No. 2087.

9. In HB 1169, PN 2087, the original title of the bill was completely struck and retitled "AN ACT TO PROVIDE FROM THE GENERAL FUND FOR THE EXPENSES OF THE EXECUTIVE, LEGISLATIVE AND JUDICIAL DEPARTMENTS OF THE COMMONWEALTH, THE PUBLIC DEBT AND FOR THE PUBLIC SCHOOLS FOR THE FISCAL YEAR JULY 1, 1995, TO JUNE 30, 1996, FOR CERTAIN INSTITUTIONS AND ORGANIZATIONS, AND FOR THE PAYMENT OF BILLS INCURRED AND REMAINING UNPAID AT THE CLOSE OF THE FISCAL YEAR ENDING JUNE 30, 1995; TO PROVIDE APPROPRIATIONS FROM THE STATE LOTTERY FUND, THE ENERGY CONSERVATION AND ASSISTANCE FUND, THE HAZARDOUS MATERIAL RESPONSE FUND, THE STATE STORES FUND, THE MILK MARKETING FUND, THE HOME INVESTMENT TRUST FUND, THE EMERGENCY MEDICAL SERVICES OPERATING FUND, THE BEN FRANKLIN/IRC PARTNERSHIP FUND, THE TUITION PAYMENT FUND AND THE BANKING DEPARTMENT FUND TO THE EXECUTIVE DEPARTMENT; TO PROVIDE APPROPRIATIONS FROM THE RESTRICTED REVENUE ACCOUNT WITHIN THE GENERAL FUND TO THE PENNSYLVANIA PUBLIC UTILITY COMMISSION; TO PROVIDE APPROPRIATIONS FROM THE JUDICIAL COMPUTER SYSTEM AUGMENTATION ACCOUNT TO THE JUDICIAL DEPARTMENT; TO PROVIDE APPROPRIATIONS FROM THE MOTOR LICENSE FUND FOR THE FISCAL YEAR JULY 1, 1995, TO JUNE 30, 1996, FOR THE PROPER OPERATION OF THE SEVERAL DEPARTMENTS OF THE COMMONWEALTH AND THE PENNSYLVANIA STATE POLICE AUTHORIZED TO SPEND MOTOR LICENSE FUND MONEYS; TO PROVIDE FOR THE APPROPRIATION OF FEDERAL FUNDS TO THE EXECUTIVE AND JUDICIAL DEPARTMENTS OF THE COMMONWEALTH AND FOR THE ESTABLISHMENT OF RESTRICTED RECEIPT ACCOUNTS FOR THE FISCAL YEAR JULY 1, 1995 TO JUNE 30, 1996, AND FOR THE PAYMENT OF BILLS REMAINING UNPAID AT THE CLOSE OF THE FISCAL YEAR ENDING JUNE 30, 1995; AND TO PROVIDE FOR THE ADDITIONAL APPROPRIATION OF STATE AND FEDERAL FUNDS FOR THE EXECUTIVE DEPARTMENT OF THE COMMONWEALTH FOR THE FISCAL YEAR JULY 1, 1994, TO JUNE 30, 1995, AND FOR THE PAYMENT OF BILLS INCURRED AND REMAINING UNPAID AT THE CLOSE OF THE FISCAL YEAR ENDING JUNE 30, 1994.

10. As amended by the House Rules Committee, HB 1169, PN 2087 constituted a general appropriations bill for FY 1995–96 and was 220 pages long.

11. After HB 1169 was amended as described in paragraphs 9–11, *supra*, by the House Rules Committee, it was never referred to a committee in either chamber considered on three different dates in each house.

12. The day after being reported from the House Rules Committee, June 14, 1995, HB 1169, was voted on in the House. Under House rule, no amendments were allowed to HB 1169, PN 2087. The bill was debated in the House, as were motions to relax the rule prohibiting amendments. The motions were defeated, and the bill passed the House as reported by the Rules Committee by a vote of 126–77.

13. HB 1169, PN 2087 was then immediately voted on in the Senate. Under Senate rule, no amendments were allowed to HB 1169, PN 2087, nor was it referred to committee. The bill was debated in the Senate, as were motions to relax the rule prohibiting amendments. The motions were defeated, and the bill passed the Senate as reported by the House Rules Committee by a vote of 30–20.

14. HB 1169, PN 2087 was signed into law by the Governor on June 30, 1995 and be-

came effective on July 1, 1995 as Act 5A of 1995, Act of June 30, 1995.

15. HB 1169, PN 2087, which became Act 5A of 1995, Act of June 30, 1995, contained individual appropriation items as enumerated in paragraphs 48–53 of the Petition for Review and more fully described in the bill itself at pages identified in the itemization in the Petition for Review.

16. None of the entities named in the appropriation items referenced in the foregoing paragraph 15 are under the absolute control of the Commonwealth.